A. T. BIGELOW, Appellee, v. JOHN HERRINK et al., Appellants.

**STATES: Boundaries—Change in Boundary.** The boundary line between Iowa and Nebraska changes by gradual erosion or accretion, but not by avulsion. Record held to show that land the title to which was in controversy was located in Iowa, and not in Nebraska, and was the result of accretion. (See Book of Anno., Vol. 1, Preamble to Const.)

**PUBLIC LANDS: Government Ownership—Rule to Determine.** Government lands lose by erosion and gain by accretion.

**PUBLIC LANDS: Patents—Presumption.** A government patent is not conclusive that the government owned the land at the date of the patent.

Headnote 1: 36 Cyc. p. 842. Headnote 2: 32 Cyc. p. 804. Headnote 3: 32 Cyc. p. 1038.

*Appeal from Woodbury District Court.*—A. O. WAKEFIELD, Judge.

OCTOBER 27, 1925.

ACTION in equity to quiet title. The facts are fully stated in the opinion. Decree as prayed.—*Affirmed*.

*McConkey & McConkey*, for appellants.

*Stason & Stason*, for appellee.

STEVENS, J.—I. The subject of controversy between the parties to this appeal is a tract of 166.5 acres lying on the east side of the Missouri River and adjacent thereto, but whether in Woodbury County, Iowa, or Dakota County, Nebraska, is one of the main points of dispute. Appellant John Herrink is in possession thereof, and claims title thereto by grant from the United States government, dated November 20, 1922, under an act of Congress of May 20, 1862, entitled "An act to secure homestead to settlers on the public domain." The certificate of the United States land office describes the tract as Lots 1 and 2 of the N½ of the NE¼ of Section 30, Township 67 north, of Range 10 east of the 6th P. M., Nebraska. Appellee claims title to the tract as accretions to a strip of land one rod wide off the west side of Lots 1 and 2 of the northwest corner of Section 4, Township 86, and Lot 4 of Section 33, Township 87, Range 47, Woodbury County, Iowa.

The boundary between Iowa and Nebraska, as fixed by the act of Congress admitting this state to the Union, and as established by the Supreme Court of the United States in *State of Nebraska v. State of Iowa,* 143 U. S. 359 (36 L. Ed. 186), is the center of the main channel of the Missouri River. The boundary between the two states does not always remain at exactly the same place, but varies as the river gradually changes its course by erosion or the formation of accretions to one bank or the other. *State of Nebraska v. State of Iowa,* supra. This is the universal rule. *State of Arkansas v. State of Tennessee,* 246 U. S. 158 (62 L. Ed. 638); *Kitteridge v. Ritter,* 172 Iowa 55; *O'Connor v. Petty,* 95 Neb. 727 (146 N. W. 947). But where the course of the river is suddenly changed, and a new channel formed, the boundary between the two states remains as the thread of the main channel immediately preceding such change. *State of Nebraska v. State of Iowa,* supra; *State of Arkansas v. State of Tennessee,* supra; *O'Connor v. Petty,* supra; *Kitteridge v. Ritter,* supra.

1. STATES: boundaries: change in boundary.

Plats showing the government survey were offered in evidence by the respective parties. It appears from these plats that the western boundary of Iowa, which was surveyed in 1851, passes through the disputed tract in a northeasterly direction, so as to leave about two thirds thereof in Iowa, and that a

survey made in 1857 locates the eastern boundary of Dakota County, Nebraska, about three quarters of a mile east of the north line of the disputed tract. That there have been many changes during the past half century in the course of the river in this vicinity was admitted by all of the witnesses. The date of the government survey and the plat filed in the recorder's office of Dakota County, Nebraska, showing the location of the tract as described in the certificate of the government land office issued to appellant in 1922, which was after the commencement of this action, does not appear in the record, but presumably it is the same as the other survey of 1857. The last survey showing the location of the river was made in June, 1922. As located by this survey, the river flows in a southerly direction, the east bank immediately opposite the north line of the tract in question being something over one mile therefrom, and the nearest point opposite the south line about one-half mile.

It is conceded by appellee that, prior to 1870, a projection known as Blyberg Point was formed by the action of the river to the Nebraska shore, which, in course of time, extended a considerable distance to the northeast. Appellant contends that the river, in July, 1908, suddenly cut through this projection, and that the channel was thereby completely changed, leaving a large part of Blyberg Point on the east side thereof.

The government survey of the eastern boundary of Dakota County in 1857 is manifestly erroneous. This is clearly shown by the physical facts. The easternmost point of this survey intersects approximately the center of Section 4, Township 86, Range 47. Assuming the river to have been at least one-half mile in width at this point,—and it was probably considerably wider,— practically the whole of this section must have been washed away. A high bank which has an elevation of 10 or 12 feet above the surface of the ground to the west extends in a northwesterly direction from about the center of Section 16, Township 86, to the west line of Section 32, Township 87. A short distance west of the south line of Section 4 is what is known as Gumbo Point. This point resisted the encroachments of the river, and extends farther west than the high bank immediately north and south thereof. This bank, at the only point where the distance is shown on the plat, is 1,710 feet east of the east

line of the disputed tract, and.is nearly half a mile west of the center of Section 4. The high bank, as already indicated, is located a considerable distance west of the eastern boundary of Dakota County, as shown by the survey of 1857. All of the witnesses agree that the high bank marks the farthest point east ever reached by the river in that vicinity. A private survey of the north and east bank of the river, made in 1888, intersects the southwest corner of Lot 2 of appellee's tract, and passes very close to the northeast corner of the land in controversy. If this survey is correct,—and no direct evidence was introduced to show otherwise,—much of the 166.5-acre tract must have then been submerged by the river. Many witnesses describe the course of the river as it receded westward from the high bank until it reached its present location. The evidence, however, as to what became of Blyberg Point is in direct conflict. Several witnesses called by appellant testified that an attempt was made by someone in 1908 to dynamite a channel through same, close to the Nebraska shore; that their attempt was defeated by farmers in that vicinity; but that the river, nevertheless, suddenly, and within two days, in July, 1908, cut its way through the point, leaving a large part thereof on the east side of the river. If this testimony is true, the land thus cut off and the tract in controversy, if a part thereof, belongs in Nebraska.

The character of the soil, of the vegetation, and the size and variety of the trees growing on the disputed tract tend in some measure to corroborate the testimony of appellant's witnesses. There is a conflict, however, in the evidence as to all of these matters. Numerous witnesses, whose knowledge of the subject extended back many years, and whose familiarity with the surroundings is clearly established, testifying on behalf of appellee, denied that Blyberg Point was cut off by a sudden change of the river, and assert that it was carried away by erosion, and that the recession of the river westward was gradual, and the result of deposits of sand and soil thrown up along the eastern shore. The character of the vegetation and the size of the trees growing on the land, as seen by these witnesses, are materially different from that described by appellant. A review of this testimony would in no wise strengthen our opinion, and

we deem it sufficient to state the conclusion arrived at, which is that the land in controversy was formed by the action of the river as it receded westward; that Blyberg Point was not cut off; and that no sudden change in the course of the river occurred. This conclusion is supported, not only by the greater weight of the testimony, but also by the physical facts. If the land in question was ever Nebraska territory, it was washed away by the Missouri River, and made back to the Iowa side as the stream gradually changed its course towards the west.

II. The title of the government to land bordering on the Missouri River is subject to the same laws as that of a private owner. If it is cut off by erosion, the government loses title

2. PUBLIC LANDS: government ownership: rule to determine.

thereto, and if accretions are added, they become a part of the government tract. *Jefferis v. East Omaha Land Co.*, 134 U. S. 178 (33 L. Ed. 872); *Rice v. Minnesota & N. W. R. Co.*, 1 Black 358 (17 L. Ed. 147); *Coulthard v. McIntosh*, 143 Iowa 389. By the gradual changing of the channel of the river, the land in controversy, if originally in the state of Nebraska, was washed away, and made back to the Iowa shore, or became a part of an island attached to the bed of the river in that vicinity. The government made no survey of the tract immediately preceding the execution of the patent under which appellant claims title. The land was located by a private surveyor employed by him.

A government patent is not necessarily conclusive against an adverse claimant, and it is permissible to show that, at the time the patent was issued, the government did not own the land

3. PUBLIC LANDS: patents: presumption.

described therein. *Marsh v. Nichols, Shepard & Co.*, 128 U. S. 605 (32 L. Ed. 538); *Rice v. Minnesota & N. W. R. Co.*, supra; *Webber v. Axtell*, 94 Minn. 375 (6 L. R. A. [N. S.] 194); *Stoner v. Royar*, 200 Mo. 444 (98 S. W. 601). The cases so holding are readily distinguishable from those cited and relied upon by appellant. *Rood v. Wallace*, 109 Iowa 5, and *State v. Red River Lbr. Co.*, 109 Minn. 185 (123 N. W. 412), are not in point. A decision by the United States land department of a dispute as to whether certain land is swamp land, within the act of Congress, cannot be collaterally attacked. The distinction between the legal effect of a patent void because the government did not have title

to the land sought to be conveyed, and an attempt to collaterally impeach the finding of the government land office upon a disputed question of fact, is obvious. The testimony in this case completely overcomes every presumption arising from the mere patent.

III.   Appellee's title, if any, rests upon the claim that the tract was formed as accretions to land owned by him.   Accretions are the gradual and imperceptible addition of soil to the shore line by the action of the water to which the land is contiguous.  As we have already shown, the river, at the time the private survey was made, in 1888, flowed over a part, if not all, of the disputed tract.  It is argued that the sudden change in the course of the river in 1908 left a large body of dead water between the Iowa shore and Blyberg Point, and that no accretions ever formed to the Iowa shore.  As the change in the course of the river was gradual, and Blyberg Point was not cut off from the Nebraska shore so as to convert it into an island, the presence of water at this point must be accounted for upon some other theory.  It is shown that there are depressions, swales, and sloughs west of appellee's shore line and along the high bank to the south, in which more or less shallow water of varying width is to be found.  It appears, however, that sand bars attached to the mainland have formed at various points along the shore, and that these have been gradually extended westward, rising above the surface of the water.  The extent of these sloughs and depressions which are covered by water is left somewhat vague by the testimony, and it is uncertain whether the water is drainage from the surrounding surface or whether it backs up from below.  The mere presence of swales and sloughs in the land thrown up by the river against the shore line does not necessarily determine its character as accretions.  *King v. Young,* 76 Me. 76 (49 Am. Rep. 596); *Minton v. Steele,* 125 Mo. 181 (28 S. W. 746); *Bellefontaine Imp. Co. v. Niedringhaus,* 181 Ill. 426 (55 N. E. 184); *Stoner v. Royar,* supra; *Dowdle v. Wheeler,* 76 Ark. 529 (89 S. W. 1002); *Payne v. Hall,* 192 Iowa 780.

As we understand the record, the main body of the large tract involved in this litigation is attached to the shore line, and is of such a substantial character that cottonwood and other

trees a foot or more in diameter are now growing thereon. Some of the tract in controversy has been cultivated, and is described as valuable agricultural land. It may be concluded that the evidence on this point is not as conclusive as it sometimes is in cases of this character, but we think it reasonably sufficient.

What we have said up to this point applies only to the appeal of Herrink. F. J. and E. J. Jauron are noted as appellants in the original abstract; but they are not shown to have appealed from the decree, which, as we understand it, is not, on the merits, adverse to them; but, as they served no notice of appeal, this is not material. C. W. Marsh and F. M. Casady also appear as appellants, and they, with the Jaurons, join in the brief of appellant; but they are not shown to have been parties to the litigation, except for the purpose of filing a motion to dismiss the case, which motion was without merit.

Other points are insisted upon by appellants in argument, to which we have not specifically referred. They are sufficiently answered, however, by what has been said upon the decisive questions in the case.

The decree below meets with our approval, and is, therefore,—*Affirmed.*

FAVILLE, C. J., and DE GRAFF and VERMILION, JJ., concur.