## WISCONSIN v. MICHIGAN.

No. 15, original. Argued February 11, 1935 and April 8, 1935.—Decided May 20, 1935.

*Mr. Adolph J. Bieberstein,* with whom *Mr. James E. Finnegan,* Attorney General of Wisconsin, *Mr. Joseph G. Hirschberg,* Deputy Attorney General, and *Mr. J. E. Messerschmidt,* Assistant Attorney General, were on the brief, for plaintiff.

*Mr. Meredith P. Sawyer,* with whom *Mr. Harry S. Toy,*
Attorney General of Michigan, and *Mr. Edward A.
Bilitzke,* Assistant Attorney General, were on the brief,
for defendant.

MR. JUSTICE BUTLER delivered the opinion of the Court.

This case concerns the Green Bay section of the bound-
ary between these States. In *Michigan* v. *Wisconsin,* 270
U. S. 295, the entire boundary was involved. As to that
section, the question was whether islands within the bay
and other islands surrounded by its waters and those of
Lake Michigan belonged to one or the other State. The
territory of Wisconsin was created by an Act of April 20,
1836, c. 54, 5 Stat. 10. The stretch of boundary in ques-
tion is described: ". . . to a point in the middle of said
lake [Michigan], and opposite the main channel of Green
Bay, and through said channel and Green Bay to the
mouth of the Menomonie river. . . ." By the Enabling
Act of June 15, 1836, c. 99, 5 Stat. 49, under which
Michigan became a State, January 26, 1837, it is de-
scribed in the reverse direction: ". . . thence, down the
centre of the main channel of the same [Menominee
river], to the centre of the most usual ship channel of
the Green bay of Lake Michigan; thence, through the
centre of the most usual ship channel of the said bay to
the middle of Lake Michigan . . ."

As to the section there involved, we said:

" In determining the boundary through this section,
the question is not embarrassed by differences of de-
scription. [p. 314] . . . The evidence shows that
there are two distinct ship channels, to either of which
this description might apply. From the mouth of the
Menominee, the channel, according to the Michigan
claim, proceeds across the waters of Green Bay in an

easterly direction until near the westerly shore of the
Door County peninsula; thence, in close proximity to the
shore, in a northerly direction to a point opposite Death's
Door Channel (or *Porte des Morts*); thence through that
channel into Lake Michigan. The channel claimed by
Wisconsin, after leaving the mouth of the Menominee,
turns to the north and pursues a northerly direction to a
point opposite the Rock Island passage which lies between
Rock Island and St. Martin's Island; thence through the
Rock Island passage into Lake Michigan. The territory
in dispute lies between these rival channels, and embraces
two groups of islands: (1) Chambers Island, the Straw-
berry Islands, and a few others, small and unnamed, all
within the main waters of Green Bay west of the Door
County peninsula; and (2) Rock, Washington, Detroit
and Plum islands, lying between Death's Door Channel
and the Rock Island passage, at the north end of the
peninsula. The evidence as to which of the two ship
channels was the usual one at the time of the adoption of
the Michigan Enabling Act is not only conflicting, but
of such inconclusive character that, standing alone, we
could base no decree upon it with any feeling of cer-
tainty. [p. 315] . . . But, it is not necessary, for . . .
the title of Wisconsin to the disputed area now in ques-
tion, is established by long possession and acquiescence;
and this conclusion is justified by evidence and conces-
sions of the most substantial character. [p. 316] . . .
The result is that complainant has failed to maintain her
case in any particular; and that the claims of Wisconsin
as to the location of the boundary in each of the three
sections are sustained." p. 319.

The decree (272 U. S. 398) defines the section:
" thence down the center of the main channel of the . . .
Menominee, to the center of the harbor entrance of said
Menominee River, thence in a direct line to the most
usual ship channel of Green Bay, passing to the north of

Green Island and westerly of Chambers Island and through the Rock Island Passage into Lake Michigan, by courses and distances as follows: From a point midway between the outer ends of the Menominee River piers, thence east by south, seven and one-half miles to the center of the most usual ship channel of the Green Bay, thence along said ship channel north by east one-eighth east, eight and seven-eighths miles, thence continuing along said ship channel north by east seven-eighths east, twenty-seven miles, thence continuing along said ship channel, east one-fourth north, ten and one-fourth miles, thence east three-fourths north to the boundary between the State of Michigan and the State of Wisconsin in the middle of Lake Michigan."

Michigan concedes that the first distance should be seven and one-eighth instead of seven and one-half miles. Wisconsin insists that the first course should be eliminated and a more northerly one substituted for it. The parties agree that the third course was intended to be " northeast seven-eighths east " instead of " north by east seven-eighths east." Wisconsin claims that, even if corrected as to the course and distance mentioned, the description would deprive her of about 35 miles of fishing area opposite the city of Menominee, which, as she says, has always been under her jurisdiction. And she prays that this description be changed so as to read:

" to the outer end of the piers at Menominee being the center of the harbor entrance of said Menominee River, thence in a direct line to a point half-way from Chambers Island to the Michigan mainland measured from the water's edge at the narrowest channel; thence in a direct line to the west end of the Whaleback Shoal; thence in a direct line to a point half-way from the water's edge adjacent to Boyer's Bluff to the water's edge on the Michigan mainland at the mouth of Bark River; thence in a direct line to a point half-way from the water's edge at

Boyer's Bluff to Driscoll Shoal; thence in a direct line to the light on St. Martin's Shoal; thence east three-quarters north to the boundary between the State of Michigan and the State of Wisconsin in the middle of Lake Michigan."

We appointed Frederick F. Faville special master. And, in accordance with our order, he has taken the evidence, made findings of fact, stated his conclusions of law and recommendations for a decree, all of which, with a transcript of the testimony, the maps, charts and other exhibits, are included in the report he has submitted to the court.

Michigan, while conceding the court has power to make the decree correspond with the opinion in *Michigan* v. *Wisconsin,* asserts that the boundary line here in controversy was involved in the former case and suggests that the court is without jurisdiction to establish any other line. The evidence shows, and the master found: After announcement of our decision, counsel for the parties agreed upon a form of decree to carry it into effect and consented that it be entered. Due to mutual mistakes, it was erroneous in the respects above indicated, and because of their consent it was adopted and entered by the court. The location of the boundary line dividing the waters of the bay between the States was not in issue. No evidence was offered for the determination of that question. It was all addressed to the controversy concerning the islands— the matter then in dispute. The master rightly concluded the court has jurisdiction to correct the decree (*Thompson* v. *Maxwell,* 95 U. S. 391, 397, 399) and to establish the true boundary line through Green Bay. *Hopkins* v. *Lee,* 6 Wheat. 109, 113, 114. *Oklahoma* v. *Texas,* 256 U. S. 70, 86.

The parties rightly assume that there is no difference between the description of the boundary through Green Bay given in the Act creating Wisconsin Territory and that specified in the Michigan Enabling Act. 270 U. S.

314. The evidence shows, and the master found: When these Acts were passed, there was no " main " or " most usual ship " channel. Movements of sailing vessels, then used, were not limited to any channel and, except to avoid islands, shoals and reefs, they went directly to their destinations. Ships came and went between Lake Michigan and Green Bay to and from the mouth of the Menominee, and the southerly end of the bay, the site of the city of Green Bay. They passed east and west of Chambers Island and through the Strawberry passage. Neither State has ever exercised jurisdiction over the triangular area at the mouth of the Menominee or over any other waters of the bay that are now in controversy.

As it is impossible to identify any channel in the bay as that indicated by the Acts referred to, the intention of Congress must be otherwise ascertained. By principles of international law, that apply also to boundaries between States constituting this country, it is well established that when a navigable stream is a boundary between States the middle of the main channel, as distinguished from the geographical middle, limits the jurisdiction of each unless otherwise fixed by agreement or understanding between the parties. That rule rests upon equitable considerations and is intended to safeguard to each State equality of access and right of navigation in the stream. *Iowa* v. *Illinois,* 147 U. S. 1, 7. This court has held that, on occasion, the principle of the *thalweg* is also applicable to bays, estuaries and other arms of the sea. *Louisiana* v. *Mississippi,* 202 U. S. 1, 50. *New Jersey* v. *Delaware,* 291 U. S. 361, 379. The doctrine of the *thalweg* is a modification of the more ancient principle which required equal division of territory, and was adopted in order to preserve to each State equality of right in the beneficial uses of the boundary streams as a means of navigation. *Minnesota* v. *Wisconsin,* 252 U. S. 273, 282. No right of either party to use the waters of the bay for

462

navigation is here involved. Questions of territorial jurisdiction in respect of fishing constitute the occasion of the present controversy. And it confidently may be assumed that, when fixing the boundary lines in the waters of the bay, Congress intended that Michigan and the State to be erected out of Wisconsin Territory should have equality of right and opportunity in respect of these waters, including navigation, fishing and other uses. On the facts found, equality of right can best be attained by a division of the area as nearly equal as conveniently may be made, having regard to the matters heretofore litigated and finally adjudged between these States. The rule that the States stand on an equal level or plane under our constitutional system (*Wyoming* v. *Colorado,* 259 U. S. 419, 465, 470) makes in favor of that construction of the boundary provisions under consideration. Cf. *Connecticut* v. *Massachusetts,* 282 U. S. 660, 670.

The pleadings reflect opposing claims as to the title to some part of tracts called " Grassy Island " and " Sugar Island," bordering on the north bank, and a short distance from the mouth, of the Menominee river. The master found that neither is an island and that each is a part of the mainland of Michigan, and concluded that both belong to that State. Wisconsin does not except to any of the findings or conclusions in respect of these tracts.

The decree to be entered in this case will establish the boundary through and along, or near, the middle of the waters of Green bay that are here involved. That line commences at a point midway between the piers at the harbor entrance of the Menominee River; thence east by south seven and one-eighth miles; thence approximately north by east one-eighth east, about eight and seven-eighths miles; thence to and along a line in or near the middle of the bay to a point west of the Rock Island passage; thence easterly by courses and distances to be designated through that passage to the boundary in the mid-

dle of Lake Michigan. The decree will appropriately define the tracts called "Grassy Island" and "Sugar Island" and declare them to belong to Michigan.

The case is referred to the special master, and he is directed to prepare and submit to the court a form of decree which will give effect to this decision. Inasmuch as the preparation of the decree may involve the ascertainment of physical facts and the formulation of technical descriptions, the master is authorized to hear counsel, take evidence and procure such assistance, if any, as may be necessary to enable him conveniently and promptly to discharge the duties here imposed upon him. He may call upon counsel to propose forms of decree. He is directed to give them opportunity to submit objections to the form prepared by him and to include the objections, if any, in his report.

*It is so ordered.*