GEORGE V. WILTSE ET AL., APPELLANTS, v. ROBERT O. BOLTON ET AL.: IRA HAGGERTY ET AL., APPELLEES.
272 N. W. 197

FILED MARCH 12, 1937. No. 29830.

*William J. Maher*, for appellants.

*Thomas & Thomas, contra.*

Heard before ROSE, GOOD, PAINE and CARTER, JJ., and RYAN and KROGER, District Judges.

KROGER, District Judge.

Plaintiffs filed an action in equity for the purpose of quieting title to the southeast quarter of the northeast quarter and the southeast quarter, all in section 20, township 19 north, range 12 east of the sixth P. M., in Washington county, Nebraska, and all legal accretions thereto, which are described by metes and bounds, and alleged that they were the owners in fee simple of all the premises and in actual possession thereof, and alleged that the various defendants to the action were each making some claim to a part of said premises adverse to plaintiffs' title, and prayed for a decree quieting title in them and that defendants and all persons claiming under them be enjoined from interfering with plaintiffs' possession of said lands.

Some of the defendants defaulted, but separate answers were filed by Verne Pfeiffer and Ira Haggerty. Verne Pfeiffer in his answer denies the allegations of plaintiffs' amended petition, and further alleges that the southwest

quarter of the southeast quarter of said section 20 was government land, subject to homestead entry, and that in December, 1930, he made entry on said land under the homestead laws of the United States, and has since been in possession thereof and has made valuable improvements thereon, and that said last described tract never was the property of the plaintiffs, nor had they any claim thereto as accretion to lands owned by them, and further alleged that, if plaintiffs had any claim to said land, they are guilty of laches in that they failed to assert it, but allowed defendant to make valuable improvements thereon, and are now estopped from asserting any claim thereto by reason of laches.

The separate answer of Ira Haggerty is similar to that of Verne Pfeiffer, excepting that he alleges that he is in possession of a tract of sand-bar land bordering on the Missouri river, which lies between the tract claimed by defendant Pfeiffer and the east bank of the Missouri river, and he does not claim that he entered by any color of title or right, but apparently is holding under what has been termed "squatter's rights."

Trial was had in the district court for Washington county, and a decree was entered in said action, finding generally in favor of defendants Pfeiffer and Haggerty, and against the plaintiffs, and dismissing plaintiffs' action at their costs. From this decree, plaintiffs prosecute this appeal.

The plaintiffs trace their title to the southeast quarter of the northeast quarter and the north half of the southeast quarter and the southeast quarter of the southeast quarter of section 20, township 19 north, range 12, east of the sixth P. M., through mesne conveyances to the original patentee who obtained patent in the year 1897, and now claim title to the southwest quarter of the southeast quarter and additional lands to the south and west by reason of their being accretions to the deeded land owned by them.

It appears from the evidence that in 1856 the United States government caused a survey to be made of lands

adjoining the Missouri river in Washington county. At that time the Missouri river, at a point somewhat north of the land in controversy, turned in an easterly direction and then bent in a horse-shoe form to the south and back to the west, so that the main channel of the river was some considerable distance to the north and east of the tract we are now concerned with. At some later date a new channel was made by the Missouri river which cut across a large portion of said section 20 and eliminated the horse-shoe bend hereinbefore mentioned. The parties seem to be agreed that as late as 1908 the southwest quarter of the southeast quarter of said section 20 (hereinafter referred to as the Pfeiffer tract) was entirely in the channel of the Missouri river, and that the river, along its east bank, had eroded its way into the deeded lands now owned by the plaintiffs. In the spring of 1908 the main channel of the Missouri river changed to a point approximately one-half mile west of its former channel, and the evidence is in conflict as to what brought about this change, the plaintiffs claiming that it was caused by the formation of accretions to their shore line and defendants claim that it was due to an avulsion primarily induced by an ice jam forming near the east shore line. While the evidence is somewhat conflicting, a fair appraisal of same would indicate that, after the change in 1908, the river gradually eroded the easterly banks thereof until in 1913 it had again eroded all but a few acres of the Pfeiffer tract, and then, by gradual stages and processes, again moved in a westerly direction until at the present time it is approximately one-half mile south and west of the southwest corner of the Pfeiffer tract.

On the basis of these facts, which are quite conclusively established by the evidence, the plaintiffs contend that the court's findings and judgment are contrary to law and contrary to the evidence.

Defendants contend, first, that plaintiffs have not pleaded or proved any accretions; second, that the general land office of the United States has decided that plaintiffs' lands were not riparian at any time since 1897, when patent was

issued to the same, and consequently could not have any accretions; and, third, that plaintiffs are estopped by their conduct from questioning defendants' title.

The petition of plaintiffs, in so far as it refers to accretions, is very brief, and if timely objection had been made, no doubt the court would have required the plaintiffs to set out their claims to accretions with more particularity. No complaint was made, however, but, on the contrary, defendants in their answer elaborately pleaded facts negativing plaintiffs' claim of accretions and tending to establish the creation of the land in controversy as the result of an avulsion. The case was tried on the theory that plaintiffs had sufficiently pleaded their claim to the land as accretions to riparian lands owned by them, and defendants cannot now raise the objection that the petition did not properly plead facts establishing the formation of the land in controversy as accretions.

The evidence was quite voluminous and deals almost entirely with the history of the Missouri river as it affected the lands in controversy since the year 1908. The parties seem to be agreed that as late as the spring of 1908 the east bank of the river was entirely on the deeded land now owned by the plaintiffs, so it necessarily follows that plaintiffs' lands, at that time, were riparian. In the spring of 1908 an ice gorge formed along the land now owned by plaintiffs and for some distance to the north thereof. As a result of this ice gorge the river shifted its main channel westward, and when the ice disappeared there was a narrow channel, called Boyd's slough, along plaintiffs' land and then a large sand-bar between Boyd's slough and the main channel of the river. As a result of the deposit of soil-building material during high water, Boyd's slough had gradually filled, so that there is no channel there now and has not been for many years. By the same process the sand-bar to the west of Boyd's slough has been built up until, at the present time, a large portion of the same is suitable for cultivation. The formation of land by accretion has been repeatedly defined and we are not going to add to

that long list. For definition see *Independent Stock Farm v. Stevens*, 128 Neb. 619, 259 N. W. 647.

We have carefully examined all of the evidence in this case and are convinced that the action of the river in the spring of 1908 was not an avulsion, but the shifting of the main channel from the east to the west side of the river bed, and that the lands in controversy were formed by accretion, and not by an avulsion.

This leads us to a consideration of what effect is to be given to the finding of the general land office that plaintiffs' lands have not been riparian since patent to same was issued in 1897.

It may be noted that this finding was made after the courts of this state had obtained jurisdiction of the parties and subject-matter, and had been called upon to decide the precise question. If this finding is binding on this court and the parties to this action, then the fact that all parties seem agreed that as late as 1908 the land was riparian would be immaterial. We believe it will be conceded that the general land office has jurisdiction only where government lands are concerned, and if, in this case, the Pfeiffer tract was not government land at the time Pfeiffer filed on the same, and at the time of the purported ruling by the general land office, the action of the land office would be a nullity.

Thus, in 22 R. C. L. 305, sec. 59, we find it stated: "Though the officers of the land department exercise functions in their nature judicial, this has reference to cases in which individuals have, as between each other, contested the right to a patent before those officers. In no case have documents, with the recitals therein, and the presumptions of law and fact arising thereon, shown to have been executed by officers of the government, within the apparent scope of their authority, been held sufficient, where the fact in issue was whether the government at that time had any title to convey, to establish the fact in dispute, as against parties claiming a preexisting, adverse and paramount title in themselves. The land department has no

jurisdiction to transfer lands which are not at the time public property, having been previously disposed of. All that can be reasonably or lawfully claimed as the effect of documents of title issued by the department is that they pass such estate, and such estate only, as the government itself, in whose name and on whose behalf the official acts appear to have been done, had at the time."

In 1859 the Pfeiffer tract was government land. At some time subsequent, due to an avulsion of the Missouri river, this tract was entirely obliterated and washed away; a soil survey map made by the agricultural department of the government in 1915 conclusively establishes that fact. That this tract was a part of the bed of the Missouri river as late as the spring of 1908, long after patent had issued to plaintiffs' deeded land, cannot be seriously disputed. If the Pfeiffer tract had been homesteaded before it was taken by the river, the private owner would have lost his title by such action of the river, and even though at a later date the river receded and the boundaries of the land could again be established, it would not go to the former owner. *Yearsley v. Gipple*, 104 Neb. 88, 175 N. W. 641.

Does a different rule apply to lands owned by the government? This precise question was before the supreme court of Iowa in the case of *Bigelow v. Herrink*, 200 Ia. 830, 205 N. W. 531, and the court there held: "The title of the government to land bordering on the Missouri river is subject to the same laws as that of a private owner. If it is cut off by erosion, the government loses title thereto, and, if accretions are added, they become a part of the government tract." And citing *Jefferis v. East Omaha Land Co.*, 134 U. S. 178; *Rice v. Minnesota & N. W. R. Co.*, 1 Black (U. S.) 358; *Coulthard v. McIntosh*, 143 Ia. 389, 122 N. W. 233. Our attention has not been called to any decisions to the contrary. The case of *First Nat. Bank of Decatur v. United States*, 59 Fed. (2d) 367, relied upon by defendants, is not in point, as in that case the erosion and subsequent accretion of the lands involved had occurred before the United States parted with title to any of the land,

either that which was eroded or that which became riparian by reason of the erosion. The government was at all times the riparian owner and, because of the particular circumstances surrounding the conveyances of the lands there involved, the conveyances were held to convey no more property than described in the instruments of conveyance.

Under the facts in this case, we find that in 1930, when the defendant Pfeiffer made his homestead entry, the government did not own any lands known as the southwest quarter of the southeast quarter of section 20, township 19 north, range 12, east of the sixth P. M., in Washington county, Nebraska, but that said lands, long prior to that time, had been eroded and destroyed by the action of the Missouri river, and any title which the government at one time had was thereby lost, and that, by the subsequent action of the river, the lands in controversy became accretion lands to the riparian land owned by the plaintiffs.

We now consider the question of estoppel raised by the defendants. According to the testimony of the defendant Pfeiffer, he was living at Odebolt, Iowa, over 100 miles from the land in controversy when, in the fall of 1930, through some relative, he was informed that the land we have hereinbefore referred to as Pfeiffer tract was government land and subject to homestead entry; that he made his filing thereon and about December 5, 1930, entered upon the land and commenced building a small house for shelter. It was not until after he had moved onto the land that he met either of the plaintiffs. He testifies that plaintiffs did not protest against his occupying the land and that he assisted one of the plaintiffs in building a fence along the east line of the forty acres claimed by him, and that plaintiffs pointed out to him what they claimed was the northeast corner of his tract, and that plaintiffs agreed to build a fence along the east line of said forty if he would build a fence along the north side of the same, which he did. The improvements made by defendant Pfeiffer are valued by him at $200, exclusive of his own labor.

The defendant Haggerty did not testify to any facts that

would have any bearing on the question under consideration.

This court, in the case of *Nash v. Baker,* 40 Neb. 294, 58 N. W. 706, held: "In order to constitute an equitable estoppel by silence or acquiescence, it must be made to appear that the facts, upon which it is sought to make the estoppel operate, were known to the party against whom the estoppel is urged and unknown to the party urging it."

And, in 10 R. C. L. 692, sec. 21, we read: "But to effect an estoppel by silence it must also appear that the person had a full knowledge of the facts and of his rights, that he had an intent to mislead, or at least a willingness that others should be deceived, and that the other party was misled by his attitude."

Applying those rules to the facts in this case, we find that the defendant Pfeiffer made entry before he had even met the plaintiffs, and that in making entry he in no manner relied upon any representations or conduct on the part of the plaintiffs. At the time of his entry, plaintiffs were litigating with one McFerrin over the ownership of this particular tract. No decree was entered in that litigation until March, 1931, and, before decree was entered, defendant Pfeiffer knew of that litigation. This action was commenced in December, 1933, and the only conduct on the part of plaintiffs that might be considered on the question of estoppel is the testimony regarding the fences. In considering that testimony, it must be borne in mind that the defendant Pfeiffer was claiming under his homestead entry, and no doubt the plaintiffs were somewhat in doubt as to whether their claim was superior to that of the defendant Pfeiffer. At any rate, the defendant Pfeiffer had knowledge of all the facts affecting the title to this land, and there was no concealment of any material facts from him, and his filing on the land and the making of such improvements as were made cannot be charged to any conduct on the part of the plaintiffs tending to mislead the defendant. The burden was upon the defendants to establish estoppel by conduct and in this they failed.

It follows from what has been said that the findings and judgment of the learned trial court were erroneous, and the judgment of the trial court is reversed and remanded, with directions to enter decree in conformity with this opinion.

REVERSED.