DAILEY et al., Respondents, v. RYAN, Appellant

(21 N. W.2d 61.)

(File No. 8747. Opinion filed December 17, 1945.)

Rehearing Denied March 4, 1946.

**Walter R. Johnson,** Atty. Gen. of Nebraska, **Robert A. Nelson,** Asst. Atty. Gen., of Nebraska, and **A. J. Beck,** of Elk Point, for Appellant.

**O. C. Donley,** of Elk Point, and **C. M. Stilwill,** of Sioux City, Iowa, for Respondents.

SMITH, P.J. This action involves a body of land in Section Thirty-six, Township Thirty, Range Seven, of the

survey of lands originally in Dakota County, Nebraska. It was brought under SDC 37.15 and the complaint alleges that the defendant wrongfully withholds possession of the property from plaintiffs. This land was originally granted by the United States to the State of Nebraska for the support of common schools. The defendant is in possession thereof under a lease from the State of Nebraska. The plaintiffs claim title by adverse possession. The trial resulted in a judgment for the plaintiffs and the defendant has appealed.

The first question for consideration involves the territorial jurisdiction of this state and of the trial court. In 1905 the States of Nebraska and South Dakota entered into a compact reading:

"Witnesseth, that subject to the consent of Congress, that portion of the boundary line between the State of Nebraska, and the State of South Dakota, lying and being north of Dakota County, Nebraska, shall be in the middle of the main channel of the Missouri River as now existing."

This compact was approved by the Congress in words as follows:

"That the portion of the boundary line between the State of South Dakota and State of Nebraska lying and being south of Union County, South Dakota, shall be in the middle of the main channel of the Missouri River as now existing, and the compact between said States establishing said boundary line is hereby approved." Act of March 1, 1905, Chapter 1295, Vol. 33. Part 1, United States Statutes at Large, 820.

Concededly, the main body of the property involved in this litigation is located to the south or on the Nebraska side of the line of the main channel of the Missouri River as it existed in 1905. Approximately thirty acres of the tract is located to the north, or on the South Dakota side of that line. However, changes have occurred in the course of the main channel of the river since the 1905 compact. Since a time long prior to the commencement of this action, the main channel of the river has been following a course to the south of Section Thirty-six, thus throwing all of the property in litigation on the South Dakota side of the river.

Predicated upon the foregoing compact and the authoritative holding of the United States Supreme Court in New Mexico v. Texas, 275 U. S. 279, 48 S. Ct. 126, 72 L. Ed. 280, the defendant has contended from the outset that the trial court was without jurisdiction to adjudicate the title to or possession of the property south of the middle of the channel of the Missouri River as it existed in 1905. It is the theory of the defendant that the compact established a fixed boundary line, which remained unaffected by subsequent changes in the channel of the river.

The plaintiffs, on the other hand, have as earnestly maintained that the compact fixed a boundary line which has followed the subsequent shifting of the course of the river to its present position south of Section Thirty-six, resulting in the accession of the whole of that section to the State of South Dakota. They assert that the subsequent changes in the course of the river were gradual in character, and under the pronouncements of the Supreme Court of the United States in Wisconsin v. Michigan, 295 U. S. 455, 55 S. Ct. 786, 79 L. Ed. 1541, and Missouri v. Nebraska, 196 U. S. 23, 25 S. Ct. 155, 49 L. Ed. 372, the boundary line has changed with this gradual shifting of the course of the river. See 49 Am. Jur. 242 and 59 C. J. 58. The plaintiffs advanced the further claim that the varying mid-channel line of the Missouri River has been established as the boundary line between the two states south of Union County, South Dakota, by the doctrine of prescription and acquiescence. The trial court adopted the views of plaintiffs. In resolving this issue, we first turn to a consideration of the compact between the states.

In construing a grant or cession by Virginia to United States upon which the boundary line between Kentucky and Indiana depended, Chief Justice Marshall said:

"The case is certainly not without its difficulties; but in great questions which concern the boundaries of states, where great natural boundaries are established, in general terms, with a view to public convenience, and the avoidance of controversy, we think, the great object, where it can be distinctly perceived, ought not to be defeated, by those

technical perplexities which may sometimes influence contracts between individuals." Handley's Lessee v. Anthony, 5 Wheat. 374, 383, 5 L. Ed. 113.

In a more recent case involving a dispute as to the meaning of a compact between Massachusetts and New York, Justice Stone wrote as follows:

"In ascertaining that meaning, not only must regard be had to the technical significance of the words used in the grants, but they must be interpreted 'with a view to public convenience, and the avoidance of controversy,' and 'the great object, where it can be distinctly perceived, ought not to be defeated by those technical perplexities which may sometimes influence contracts between individuals'. Marshall, C. J., in Handly's Lessee v. Anthony, 5 Wheat. 374, 383, 384, 5 L. Ed. 113. The applicable principles of English law then well understood, the object of the grant, contemporaneous construction of it and usage under it for more than a century, all are to be given consideration and weight." Massachusetts v. New York, 271 U. S. 65, 46 S. Ct. 357, 360, 70 L. Ed. 838.

■ These authoritative expressions must be read in the light of the fact that the court was interpreting treaties and grants which employed broad general terms to describe a boundary line. They furnish a guide in the exercise of judicial power in construing ambiguous compacts between states. They are not authority for the proposition that a court may substitute its notions for the judgment of the high contracting parties to an unambiguous boundary compact. In dealing with such a compact a court, we think, has no other function than to declare and enforce its clear and definite terms.

■ Prior to 1905 the states had appointed commissioners to agree upon a boundary line. The commissioners recommended "that the portion of the boundary line between the State of South Dakota and the State of Nebraska, lying and being south of Union County, South Dakota, shall be in the middle of the main channel of the Missouri River, as now existing." They attached a plat to their report, and stated therein, that "The middle of the main channel, of the

Missouri River, as now existing within the territory covered by said plat, and as determined and located by said Surveyor, is shown upon said plat by a red line." The resulting compact states, "the boundary line * * * shall be in the middle of the main channel of the Missouri River, as now existing." In our opinion the compact in unambiguous. The words "as now existing" appearing therein, utterly foreclose the construction for which plaintiffs contend. We hold that the compact describes a fixed boundary line.

It follows that the subsequent changes in the course of the Missouri have had no effect upon the boundary so fixed. In New Mexico v. Texas, supra [275 U. S. 279, 48 S. Ct. 133] the court had similar language under consideration. In that case it said:

"New Mexico, when admitted as a state in 1912, explicitly declared in its Constitution that its boundary ran 'along said thirty-second parallel to the Rio Grande * * * as it existed on the ninth day of September, one thousand eight hundred and fifty; thence, following the main channel of said river, as it existed on the ninth day of September, one thousand eight hundred and fifty, to the parallel of thirty-one degrees, forty-seven minutes north latitude.' This was confirmed by the United States by admitting New Mexico as a State with the line thus described as its boundary; and Texas has also affirmed the same by its pleadings in this cause. Since the Constitution defined the boundary by the channel of the river as it existed in 1850, and Congress admitted it as a state with that boundary, New Mexico, manifestly, cannot now question this limitation of its boundary or assert a claim to any land lying east of the line thus limited."

And it further said:

"This case is not one calling for the application of the general rule established in Nebraska v. Iowa, 143 U. S. 359, 12 S. Ct. 396, 36 L. Ed. 186; Missouri v. Nebraska, 196 U. S. 23, 25 S.Ct. 155, 49 L. Ed. 372; Arkansas v. Tennessee, 246 U. S. 158, 38 S. Ct. 301, 62 L. Ed. 638, L. R. A. 1918D, 258, and Oklahoma v. Texas, 260 U. S. 606, 43 S. Ct. 221, 67 L. Ed. 428, as to changes in State boundary lines caused by gradual accretions on a river boundary."

██ The second ground urged by plaintiff in support of the territorial jurisdiction of the trial court offers greater difficulty. That difficulty does not arise because of uncertainty as to the law. By a line of decisions extending from Rhode Island v. Massachusetts, 4 How. 591, 11 L. Ed. 1116, to Arkansas v. Tennessee, 310 U. S. 563, 60 S. Ct. 1026, 84 L. Ed. 1362, it is settled that long acquiescence by one state in the assertion of a particular boundary, or in the possession and exercise of dominion and sovereignty over territory by another state, is conclusive of the rightful authority of the latter state. It is from the application of this principle to the facts revealed by this record that our perplexity arises. All that is established is that from 1915 on Union County, South Dakota, levied taxes upon the section of land which the tract in litigation is a part, and that during some period of time which is not fixed, the officers of the South Dakota school district to the north of that section listed and treated the children located thereon as children of that district. Knowledge of these acts of South Dakota on the part of Nebraska is not shown by direct evidence.

██ Knowledge on the part of Nebraska of the assumption of sovereignty over her territory by South Dakota must be established as an element of the concept of acquiscence. Although it was considering issues of a different character, we deem that which the Court said in Pence v. Langdon, 99 U. S. 578, 581, 25 L. Ed. 420 as apposite here. It there said:

"Acquiescence and waiver are always questions of fact. There can be neither without knowledge. The terms import this foundation for such action. One cannot waive or acquiesce in a wrong while ignorant that it has been committed."

██ There being no direct evidence of the knowledge of Nebraska of the acts of dominion on the part of South Dakota, it is manifest that the finding of acquiescence by Nebraska in the exercise of sovereignty by South Dakota rests on circumstantial evidence. The evidence deals with but a section of land of a somewhat larger strip of terri-

tory located between the present channel of the river and the line fixed by the 1905 compact. It is bottom land subject to seasonal floods located on the opposite side of the turbulent Missouri from Nebraska. It is very probable that Nebraska has neglected to attend to either its proprietory or sovereign interests therein. The conduct of South Dakota was not of such a public or notorious character as would necessarily come to the attention of Nebraska. In our opinion the evidence is not inconsistent with the hypothesis that Nebraska was wholly without knowledge of the fact that South Dakota was reaching its sovereign fingers across the boundary so solemnly fixed in 1905. It follows that the evidence is insufficient to support the finding of acquiescence. Erickson v. Todd, 62 S. D. 280, 252 N. W. 879.

Moreover, if because of the repetition of its act of sovereignty over a period of years, it logically could be said that knowledge of the conduct of South Dakota ultimately had been brought home to Nebraska, we would doubt the sufficiency of the evidence as a whole to invoke the doctrine of acquiescence and prescription.

 It is "long asquiescence" in a dominion, which, through the gradual process of prescription, has long since become the generally accepted and recognized sovereign of the disputed territory, which induces a court to uphold its authority in the interests of "stability of order." In Arkansas v. Tennessee, supra, it was said [310 U. S. 563, 60 S. Ct. 1030]:

"The contentions of Arkansas in opposition to the application of the priniciple of prescription and acquiescence in determining the boundary between States cannot be sustained. That principle has had repeated recognition by this Court. In Rhode Island v. Massachusetts, 4 How. 591, 639, 11 L. Ed. 1116, the Court said: "No human transactions are unaffected by time. Its influence is seen on all things subject to change. And this is peculiarly the case in regard to matters which rest in memory, and which consequently fade with the lapse of time, and fall with the lives of individuals. For the security of rights, whether of states or individuals, long possession under a claim of title is protected. And

there is no controversy in which this great principle may be involved with greater justice and propriety than in a case of disputed boundary'. * * *.

"In Michigan v. Wisconsin, 270 U. S. 295, 308, 46 S. Ct. 290, 294, 70 L. Ed 595, the Court thus referred to the recognition of this principle in international law, saying: 'That rights of the character here claimed may be acquired on the one hand and lost on the other, by open, long-continued, and uninterrupted possession of territory, is a doctrine not confined to individuals, but applicable to sovereign nations as well, * * *'. Prescription in international law, says Oppenheim, may be defined as 'the acquisition of sovereignty over a territory through continuous and undisturbed exercise of sovereignty over it during such a period as is necessary to create under the influence of historical development the general conviction that the present condition of things is in conformity with international order.' And thus he finds that prescription in international law 'has the same rational basis as prescription in municipal law—namely, the creation of stability of order.' "

As late as 1905 the sovereignty of Nebraska over this territory was the subject of compact between the states. The meager evidence adduced by plaintiffs fails to convince us that South Dakota has since so fastened itself upon that territory as to require the upholding of its authority in the interests of "stability of order."

It follows that we are of the opinion that the trial court was without jurisdiction of the land located south of the line described in the compact of 1905.

We pass to a further contention of the defendant. It is asserted by defendant that: "A suit to quiet title to common school lands brought against one claiming the right to possession by virtue of a lease from the State of Nebraska is a suit against the State and cannot be maintained without the consent of the State." Both parties have conceded throughout that Nebraska has not consented to be sued, and that a sister state cannot be sued in the courts of our state without her consent. See 49 Am. Jur. 301. It is also conceded that if this is an action against the State of Nebraska,

it is not maintainable. The point in difference between the parties is whether this is an action against the State, 'or, whether Nebraska is an indispensable party to this action.

■ To resolve that issue resort must be had to the pleadings. Mullen & Rouke v. Dwight et al., 42 S. D. 171, 173 N. W. 645. The action was originally brought against the State of Nebraska and J. H. Ryan as defendants. Nebraska appeared, asserted its immunity from suit, and a stipulation and order were entered dismissing the action as against it. In addition to the allegations prescribed by SDC 37.15, the complaint alleges: "That plaintiffs are entitled to the possession of said property, but notwithstanding the defendant J. H. Ryan on or about the 1st day of March, 1938, forcibly entered into the possession of a part of the said premises and by force and violence, and without right, forcibly evicted these plaintiffs therefrom and ever since has by force and violence continued in the possession thereof and has retained for his own use the crops grown thereon during said period, the reaonable value of the rents, issues and profits thereof being the sum of $500 per annum." The plaintiffs, among other things, prayed "that plaintiffs be adjudged and decreed to be the owners in fee of the above described property and entitled to the immediate possession thereof, and the whole thereof; * * * that the defendant J. H. Ryan be required to account for the rents, issues and profits of said real property, * * * and that plaintiffs have judgment against him for the value thereof;" The answer of the defendant describes a certain contract of lease between defendant and the State of Nebraska and alleges: "That the only rights claimed or asserted by this defendant in and to the real property referred to and described in said lease, are those which were transferred and assigned to him by said State of Nebraska under said lease, and consists of the right to the exclusive use, occupation and possession of said property from year to year, at an annual rental of 6% of its appraised value."

In writing of the remedy now appearing as SDC 37.15, under which this action was brought, this court has said:

"This section was evidently designed as a substitute for the old action formerly known as ejectment and the equita-

ble action to quiet title, and is broader and more comprehensive than either of those actions." Burleigh v. Hecht et al., 22 S. D. 302, 117 N. W. 367, 369, and see Kenny et al. v. McKenzie, 25 S. D. 485, 127 N. W. 597, 49 L. R. A., N. S., 782; and Thompson v. Thompson, 7 Cal. 2d 671, 62 P.2d 358, 117 A. L. R. 1.

As indicated in Burleigh v. Hecht, supra, the statute is intended to afford a legal remedy to an owner who seeks to recover the possession of real property wrongfully withheld from him. It may appear from the pleadings that the allegations with reference to possession are but incidental and that the gist of the action is of a different nature. Thomas v. Mettel, 41 S. D. 322, 168 N. W. 651. In substance and form the present action is revealed by the pleadings to be wholly possessory in nature. The claim against Ryan is for possession and for damages for wrongfully withholding possession, and the only right asserted by Ryan is as a tenant of his landlord, the State of Nebraska. It is not claimed that Ryan bears any other or different relation to the State. It is clear that the relief sought by plaintiffs against the defendant is only such as was formerly obtainable under the remedy of ejectment.

At common law a landlord was not an indispensable party to an action in ejectment against his tenant. Moreover, he was not a proper party to such an action. 28 C. J. S., Ejectment, § 52, page 903. Those rules have been modified by statute, but even under the statute the landlord is not a necessary party to a possessory action against his tenant. By SDC 33.0409 it is provided: " Any person may be made a defendant who has or claims an interest in the controversy adverse to the plaintiff, or who is a necessary party to a complete determination or settlement of the questions involved therein; and in an action to recover possession of real estate, the landlord and tenant thereof may be joined as defendants, * * *." And by SDC 38.0418 it is provided: "Every tenant who receives notice of any proceeding to recover the real property occupied by him or the possession thereof must immediately inform his landlord of the same * * *." The intention revealed by the

statutes to make a landlord but a proper party to a possessory action against his tenant is plain and unmistakable.

■ It follows that the State of Nebraska, the landlord of the defendant, is not an indispensable party to this possessory action against the defendant, and we entertain the view that if the State is not an indispensable party to such an action, it cannot be said that the action is against the State, even though it be consequently affected by the eviction of its tenant. See Louisville & N. R. Co. v. Bosworth, D. C., 209 F. 380, and Louisville & N. R. Co. v. Railroads Com'rs, 63 Fla. 491, 58 So. 543, 44 L. R. A., N. S., 211. We hold defendant's contention is untenable.

We do not extend this opinion to deal with the authorities upon which defendant relies. We content ourselves with observing that the actions in which the opinions were written were not merely possessory in nature.

A further contention of defendant deals with plaintiff's title. This contention comprehends the parcel of approximately thirty acres to which the jurisdiction of the court extended, and must therefore receive consideration.

Predicated upon the adverse possession of their grantor, W. W. Stevens, from 1911 to 1938, the court concluded that plaintiffs were the owners of the property. The defendant asserted that the title, during the period of Stevens' alleged adverse possession, was in the State of Nebraska in trust for its common schools, and that property of a state cannot be acquired by adverse possession. See 2 C. J. S., Adverse Possession, § 12, page 524. In response, plaintiffs contended, and the court concluded, that through the gradual erosion of the Missouri River, prior to 1905 and while the property was located in Nebraska, the whole body of the land was cut away, and hence, under the rule of Wiltse v. Bolton, 132 Neb. 354, 272 N. W. 197, and Yearsley v. Gipple, 104 Neb. 88, 175 N. W. 641, 8 A. L. R. 636, the State of Nebraska lost its title thereto.

■■ It is the settled law of Nabraska that erosion of a river, which cuts entirely across riparian land and into the land of an adjoining owner, operates to obliterate the title of him whose land was originally riparian, and that he

may not reassert his title if the river thereafter reverses its transverse wanderings and new land is formed within what were his original boundaries. Yearsley v. Gipple and Wiltse v. Bolton, supra. And it seems as well established that this rule applies to riparian lands held by the State. In Wiltse v. Bolton the court applied the rule to lands owned by the United States Government, and in so doing quoted with approval the words of the Supreme Court of Iowa in Bigelow v. Herrink, 200 Iowa 830, 205 N. W. 531, 533, as follows:

"The title of the government to land bordering on the Missouri river is subject to the same laws as that of a private owner. If it is cut off by erosion, the government loses title thereto, and, if, accretions are added, they become a part of the government tract."

Upon evidence which we find sufficient the trial court found:

"That the said lands were originally located in the State of Nebraska, having for its easterly boundary thereof the Missouri River * * *. And that prior to the year 1900 the whole of said lands, by the process of erosion, had been entirely cut away and said land destroyed, and that the channel of said river forming said boundary in the form of a crescent or ox bow had completely passed over and beyond the said land to the east, west and north thereof, * * *."

Under this record, and the finding of the trial court, supra, the conclusion is inescapable that Nebraska had lost its title to the thirty acres in question before that parcel became a part of the State of South Dakota. We therefore have no occasion to decide whether title to land held by Nebraska in South Dakota may be acquired by adverse possession. It follows that the court did not err in sustaining plaintiffs' title to the thirty acres located in South Dakota. Needless to say, its judgment does not bind the State of Nebraska.

The cause is remanded to the trial court with directions to bring its judgment into harmony with this opinion, and as so modified, the judgment is affirmed.

All the Judges concur.