#31010-a-JMK
**2026 S.D. 40**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellant,

    v.

GARY DEAN OGDEN, JR.,                           Defendant and Appellee.


APPEAL FROM THE MAGISTRATE COURT OF
THE FIRST JUDICIAL CIRCUIT
UNION COUNTY, SOUTH DAKOTA


THE HONORABLE KASEY SORENSEN
Judge


NICK MICHELS
PAUL E. BACHAND
JENNA SEVERYN
Special Assistant Attorneys General
South Dakota Department of Game, Fish
   and Parks
Pierre, South Dakota                            Attorneys for plaintiff and
                                                appellant.



MICHAEL P. SCHMIEDT
JOHN M. HINES of
Crary Huff Law, P.C.
Sioux City, Iowa                                Attorneys for defendant and
                                                appellee.



CONSIDERED ON BRIEFS
OCTOBER 7, 2025
OPINION FILED **06/24/26**

#31010

KERN, Retired Justice

[¶1.]          Gary Dean Ogden Jr. was arrested and charged with boating under the influence and several other offenses in July 2024, as a result of an incident that occurred on the Missouri River.  At the time of his arrest, Ogden was on the river between South Dakota and Nebraska.  Ogden filed a motion to dismiss for lack of jurisdiction, arguing that all relevant events occurred on the Nebraska side of the river and that South Dakota lacked jurisdiction.  After an evidentiary hearing, the magistrate court found that Ogden's arrest occurred near the Nebraska shore beyond the centerline of the river's designed channel.  The court found that state statutes SDCL 41-15-2 and 42-8-67, granting conservation officers jurisdiction over the entire boundary waters of the state to the furthermost shoreline, were federally preempted by the South Dakota-Nebraska Boundary Compact (1989 Compact).  For these reasons, the court concluded that South Dakota lacked jurisdiction and granted Ogden's motion to dismiss.

[¶2.]          After the case was dismissed, the State filed a direct appeal with this Court, which we dismissed for lack of jurisdiction.  The State then petitioned for an intermediate appeal under SDCL 23A-32-5, which we granted.  The State contends the magistrate court abused its discretion by taking evidence on Ogden's jurisdictional challenge and by dismissing the case for lack of jurisdiction.  Ogden argues the State's intermediate appeal is untimely and this Court lacks appellate jurisdiction.  Alternatively, Ogden contends the magistrate court properly dismissed the case against him for lack of jurisdiction.  We conclude we have jurisdiction over the appeal, and that the magistrate court did not err by taking testimony to

determine the jurisdictional question. We also conclude the magistrate court did not err in determining that South Dakota does not have concurrent jurisdiction over the boundary waters at issue. We affirm.

**Factual and Procedural History**

[¶3.] During the evening hours of July 27, 2024, South Dakota Wildlife Conservation Officers Josh Vanden Bosch and Taylor Kirchener were patrolling the waters of the Missouri River between Union County, South Dakota, and Dakota County, Nebraska. At approximately 9:30 p.m., they stopped a boater for lack of proper navigational lights. The officers asked the boater, subsequently identified as Ogden, to bring his boat to the middle of the river to perform a safety check.[1]

[¶4.] After tying the boats together, Officer Vanden Bosch allegedly observed indicators of Ogden's alcohol impairment. After some disagreement between the parties, the officers completed a sobriety test and informed Ogden that he was under arrest.[2] Ogden refused to cooperate and was placed in handcuffs. He was transported to the Union County jail, ticketed, and released. An information was filed against him on August 23, 2024, charging him with several offenses arising from the incident.[3]

---

1.  Officer Vanden Bosch's body camera captured the initial encounter and relative location of the boat to the river's shoreline.

2.  These facts are set forth in Officer Vanden Bosch's probable cause statement, which was not admitted into evidence during the motion hearing, but is part of the settled record. The magistrate court did not enter findings of fact regarding Ogden's alleged behavior or intoxication.

3.  Ogden was charged with the following: count 1, boating under the influence in violation of SDCL 42-8-45(1) and in the alternative under SDCL 42-8-

(continued . . .)

[¶5.]     Ogden filed a motion to dismiss for lack of jurisdiction under SDCL 23A-8-2.  He argued that South Dakota lacked jurisdiction because "all of the pertinent events occurred in Nebraska, and South Dakota law is inapplicable." Ogden contended that under the Sixth Amendment to the United States Constitution, a defendant has a right to trial in the "state, county[,] and district wherein the crime was alleged to have been committed."

[¶6.]     Ogden also asserted that South Dakota's jurisdiction over the river is governed by the 1989 Compact enacted by both states and approved by Congress. Article II(a) of the 1989 Compact, codified at SDCL 1-2-8, fixes the permanent compromise boundary between Dakota County, Nebraska, and Union County, South Dakota, at the "centerline of the designed channel of the Missouri River (the westerly channel adjacent to Section 5, Township 29 North, Range 7 East of the 6th P.M. shall be considered the main channel)."  Ogden argued that the 1989 Compact preempts conflicting state laws, particularly SDCL 42-8-67, which grants South Dakota conservation officers jurisdiction over the entire boundary waters of the state to the furthermost shorelines.

[¶7.]     In response, the State urged the magistrate court to deny Ogden's motion to dismiss, arguing that "a trial court cannot inquire into the legality or sufficiency of the evidence upon which an [i]nformation is based when considering a dismissal under SDCL 23A-8-2."  In the alternative, the State argued that the

---

(. . . continued)
        45(2); count 2, failure to have boat lights required while operating in violation of SDCL 32-3A-1(1); count 3, obstructing law enforcement in violation of SDCL 22-11-6; and count 4, resisting arrest in violation of SDCL 22-11-4(2).

language of the 1989 Compact pertains only to land, not ownership of waters overlying the land, and "both federal law and state law grant South Dakota concurrent jurisdiction over the waters of the Missouri River."

[¶8.]     At a hearing on the motion to dismiss, the State reasserted its argument that the magistrate court could not inquire into the sufficiency of the evidence because this was "really a question for the trier of fact." Over the State's objection, the court allowed Ogden to call Officer Vanden Bosch as a witness and received his body camera video into evidence as Exhibit B.[4]

[¶9.]     At the evidentiary hearing, Officer Vanden Bosch testified that he had worked as a conservation officer for 11 years and frequently patrolled the river with Nebraska officers. He acknowledged, however, that on the evening in question there were no Nebraska officers on board. When asked to describe the location of the arrest, Officer Vanden Bosch was unable to identify on a map the exact location of the stop, but stated it was "within a mile upstream from Miners Bend." He further remembered asking Ogden to move his boat toward the middle of the river to avoid rocks near the Nebraska shoreline. Officer Vanden Bosch estimated the rocks were 30 to 50 yards from Ogden's boat. Following Officer Vanden Bosch's testimony, the State reasserted its 1989 Compact interpretation argument, and the court took the matter under advisement.

[¶10.]     The magistrate court issued a memorandum opinion, followed by findings of fact and conclusions of law, which incorporated the opinion by reference,

---

4.     Exhibit A, a map of the Missouri River flowing between the two counties, was examined by Officer Vanden Bosch during the hearing but was not received into evidence, nor is it part of the record on appeal.

and entered an order of dismissal signed, dated, and filed on January 13, 2025. The court found that Nebraska and South Dakota were parties to the 1989 Compact setting the compromise boundary line between "Union County, South Dakota and Dakota County, Nebraska, fixed at the centerline of the designed channel of the Missouri River." Based on the evidence presented, the court found that when Officer Vanden Bosch initiated the stop, Ogden was "near the Nebraska shoreline" and "on the Nebraska side of the centerline of the designed channel[.]"

[¶11.] The magistrate court dismissed the case, reasoning that because the stop occurred on the Nebraska side of the boundary, Union County lacked jurisdiction to bring the charges against Ogden. Ogden's attorney of record received an email through the Odyssey system[5] on January 14, 2025, notifying him of the order granting the motion to dismiss.[6]

[¶12.] Following the magistrate court's decision, the court emailed the

---

5. Odyssey® is the electronic filing and serving platform used by the courts in South Dakota.

6. The settled record does not contain a similar email receipt for the State's attorneys of record. In his brief responding to the State's petition for intermediate appeal, Ogden argues that under SDCL 15-6-5(b)(2), it is presumed by law that the State received a similar email. SDCL 15-6-5(b)(2) provides:

> Unless otherwise ordered by the court, all documents filed with the court electronically through the Odyssey® system or served electronically through the Odyssey® system are presumed served upon all attorneys of record at the time of submission.

parties' attorneys on January 21, 2025, informing them that it had issued an order.[7] The following day, the State filed a notice of appeal. This Court dismissed the appeal on February 10 because there is no right of direct appeal from a magistrate court order under SDCL 23A-32-5. Upon receipt of this Court's order, the State filed a notice of entry of order on February 18, 2025, and on February 27, filed a petition for intermediate appeal under SDCL 23A-32-5. We granted the petition for an intermediate appeal on April 4, 2025.

[¶13.] The State raises two issues on appeal, and Ogden argues this Court lacks appellate jurisdiction. We address all three issues, which we restate as follows:

1. Whether this Court lacks jurisdiction because the petition for intermediate appeal was not timely filed.

2. Whether the magistrate court abused its discretion by considering Ogden's jurisdictional challenge and by taking evidence.

3. Whether the magistrate court erred by dismissing the case for lack of jurisdiction over Ogden's offense.

**Standard of Review**

[¶14.] The 1989 Compact is not only a contract between South Dakota and Nebraska, it is also "a federal statute enacted by Congress." *Alabama v. North*

---

7. The email provided:

> Good morning, since I've entered an order dismissing all charges[,] the file can be closed with no further court dates. The State may file their notice of appeal in accordance with the applicable statutes.

The email does not indicate that the court attached a copy of the order to the email.

*Carolina,* 560 U.S. 330, 351 (2010). We review the 1989 Compact—a federal statute—as well as our own state statutes de novo "with no deference given to the circuit court's legal conclusions." *State v. Hillyer*, 2025 S.D. 30, ¶ 10, 23 N.W.3d 782, 787 (quoting *State v. Kurtz*, 2024 S.D. 13, ¶ 12, 4 N.W.3d 1, 4). We review the trial court's decision whether to grant or deny a motion to dismiss an information for an abuse of discretion. *See State v. Fisher*, 2013 S.D. 23, ¶ 9, 828 N.W.2d 795, 799 (citation omitted). "An abuse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable.'" *State v. Huante*, 2026 S.D. 6, ¶ 30, 31 N.W.3d 715, 725 (citation omitted).

## Analysis and Decision

### 1. Whether this Court lacks jurisdiction because the petition for intermediate appeal was not timely filed.

[¶15.] As an initial matter, Ogden challenges this Court's jurisdiction over the present appeal, arguing the State's petition for intermediate appeal was not timely filed. Ogden submits that the magistrate court's email and the Odyssey email notification constituted "notice of entry of order or judgment" for purposes of SDCL 23A-32-6, which provides that "[a]n appeal under § 23A-32-4 or 23A-32-5 must be taken within ten days after written notice of entry of the judgment or order."[8] Accordingly, Ogden contends that the State's petition for intermediate

---

8. SDCL 23A-32-5 provides:

> An appeal by a prosecuting attorney may be taken to the Supreme Court from:

(continued . . .)

appeal filed on February 27, 2025, was untimely, having occurred 45 days after the State presumably received the Odyssey email informing it that the magistrate court entered the order of dismissal on January 13. In support of this argument, Ogden relies on *State v. Sharpfish* (*Sharpfish I*), 2018 S.D. 63, 917 N.W.2d 21.

[¶16.]    In *Sharpfish I*, the State petitioned for intermediate appeal on July 5, 2017, and "attached an email from the circuit court dated June 19, 2017." *Id.* ¶ 12, 917 N.W.2d at 23. In its petition, the State "acknowledged the attachment as 'constituting notice of entry' of order." *Id.* We held that under SDCL 23A-32-6, the State's appeal was untimely because it was filed "more than ten days after the notice of entry of the order[.]" *Id.* ¶ 13.

[¶17.]    In response to Ogden's reliance on *Sharpfish I*, the State notes that Ogden did not file a notice of entry of order. In the State's view, the ten-day time limit for filing began when the State filed the notice of entry on February 18, 2025. Further, the State submits that *Sharpfish I* is distinguishable because here, the

---

(. . . continued)

> (1)    An order of a circuit court or a magistrate suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding;
>
> (2)    An order of a circuit court or a magistrate sustaining a motion to dismiss a complaint on statutory grounds or otherwise.
>
> An appeal under this section may not be taken after a defendant has been put in risk of double jeopardy and is not a matter of right but of sound judicial discretion. Appeals from such orders shall be taken in the same manner as intermediate appeals in subdivision § 15-26A-3(6). No appeal taken under this section shall delay any trial unless a stay be granted in the discretion of the Supreme Court.

State did not consent to or make any concession that the magistrate court's email constituted notice of entry of the order.

[¶18.]    "The Supreme Court shall have such appellate jurisdiction as may be provided by the Legislature[.]" S.D. Const. art. V, § 5. "The right to appeal is statutory and therefore does not exist in the absence of a statute permitting it." *State v. Edelman*, 2022 S.D. 7, ¶ 10, 970 N.W.2d 239, 241 (quoting *State v. Sharpfish* (*Sharpfish II*), 2019 S.D. 49, ¶ 12, 933 N.W.2d 1, 7). "[I]t is settled law that the failure to timely file a notice of appeal is a jurisdictional defect." *State v. Mulligan*, 2005 S.D. 50, ¶ 5, 696 N.W.2d 167, 169 (per curiam) (citations omitted). As we determined in *Mulligan*, the filing requirements of SDCL 15-26A-13 are mandatory, as are the requirements of SDCL 23A-32-6. *See id.* Failure to comply with SDCL 23A-32-6 deprives this Court of appellate jurisdiction.

[¶19.]    Under SDCL 23A-32-12, the procedure to appeal an intermediate order entered in a criminal case is set forth in SDCL 15-26A-13 to -17, inclusive. SDCL 15-26A-13 provides in pertinent part:

> An appeal from an intermediate order made before trial as prescribed by subdivision 15-26A-3(6) may be sought by filing a petition for permission to appeal, together with proof of service thereof upon all other parties to the action in circuit court, with the clerk of the Supreme Court within ten days *after notice of entry of such order*.

(Emphasis added.) Additionally, SDCL 15-26A-15 requires the appealing party to attach the following documents to its petition: "(1) A conformed copy of the order sought to be reviewed; (2) All findings of fact, conclusions of law, or memorandum opinions relating thereto; and (3) *The notice of entry of the order sought to be appealed*." (Emphasis added.)

[¶20.]     The "written notice of entry" requirement of SDCL 23A-32-6 mirrors our civil rule, SDCL 15-26A-6.[9]  When examining this civil counterpart, the Court has held that written notice of entry of judgment requires more than a party's mere knowledge that an order has been entered.  *Havlik v. Havlik*, 2014 S.D. 84, ¶¶ 9–11, 857 N.W.2d 422, 425 (rejecting a claim that the mailing of a certified copy of an order by the prevailing party's counsel to opposing counsel constituted written notice of entry).  This is because a "notice of entry of judgment gives to a party the power to set running the time after which his adversary may not appeal and assures each party that the statutory period of time within which he may appeal does not commence to run until his adversary has given such notice."  *Id.* ¶ 10 (quoting *Kallstrom v. Marshall Beverages, Inc.*, 397 N.W.2d 647, 650 (S.D. 1986)); *see also In re Sales and Use Tax Refund Request of Media One, Inc.*, 1997 S.D. 17, ¶ 7, 559 N.W.2d 875, 877 (holding that a judge's letter accompanied by the judgment, findings of fact and conclusions of law did not trigger the 60-day timeframe for commencing an appeal because it did not contain a written notice of entry of judgment and the judge was not a party to the case).  Thus, knowledge that an order has been entered is not the equivalent of having received a copy of the order or notice of entry of order.

---

9.     SDCL 15-26A-6 provides in pertinent part:

> An appeal from a judgment or order must be taken within thirty days after the judgment or order shall be signed, attested, filed and written notice of entry thereof shall have been given to the adverse party.

[¶21.]    However, our cases have not consistently held that only one of the parties can provide the written notice of entry of an order or that a separate "written notice of entry" must accompany the order. In an earlier case, *Canton Concrete Products Corp. v. Alder*, neither party filed a notice of entry of order. 273 N.W.2d 120, 122 (S.D. 1978). Instead, the clerk of the court mailed certified copies of the order to the appellant's counsel who admitted he received the mailed order. *Id.* The Court held that the "mailing of a certified copy of the order constituted written notice of the filing of the order under SDCL 15-26-2."[10] *Id.* When explaining this holding, the Court stated that there is "no requirement that the service of the certified copy must be made by the attorney for the prevailing party, particularly *where the appellant's counsel admits that he received the certified copy mailed by the clerk.*" *Id.* (emphasis added).

[¶22.]    In *State v. Waters*, the Court held that hand delivery of a copy of the court's order satisfied SDCL 23A-32-6. 472 N.W.2d 524, 524–25 (S.D. 1991) (per curiam). In that case, the circuit court granted Waters's motion to dismiss and entered an order. *Id.* at 524. On the same day, Waters had a copy of the order hand delivered to the State and completed a certificate of service that he filed with the

---

10.    At the time, SDCL 15-26-2 provided:

> Any appeal other than from a judgment must be taken within sixty days after written notice of the filing of the order shall have been given to the party appealing. An appeal from the judgment must be taken within sixty days after the judgment shall be signed, attested, filed and written notice of entry thereof shall have been given to the adverse party.

SDCL 15-26-2 (repealed 1980).

court. *Id.* The State's notice of appeal was filed 21 days later. *Id.* at 525. The State alleged it did not receive notice of the order but did not contest that Waters filed a certificate of service as proof of its delivery. *Id.* The Court relied on the provision in SDCL 15-6-5(b) that "[a]n attorney's certificate of service, the written admission of service by the party or his attorney or an affidavit shall be sufficient proof of service[,]" and held that the attorney's sworn statement in the certificate of service that the State had been served with a copy of the court's order satisfied the requirements of SDCL 23A-32-6. *Id.* Rather than strictly applying the "written notice of entry" language as we have in more recent cases, the Court dismissed the appeal for lack of appellate jurisdiction based on the sufficiency of proof that the State had received a copy of the challenged order. *Id.*

[¶23.]    Given the Court's later rulings in *Havlik* and *Media One*, *supra*, whether *Alder* and *Waters* are controlling is questionable. Regardless, unlike the scenario here, there was proof in the record in those two cases, either via a certificate of service or an admission of receipt, that the appealing party had at least received a copy of the order being appealed. Nor does the current appeal present the distinctive scenario in *Sharpfish I*, in which the State attached the email from the circuit court to its petition as the notice of entry of order it was appealing from.

[¶24.]    Here, the State has never conceded that the magistrate court's email, which did not attach a copy of the order, or the presumed Odyssey notification constitutes notice of entry of the order. Further, there is no evidence in the record that Ogden served a copy of the order on the State or that court personnel provided

the State with a copy of the order. The court's email merely stated, "Good morning, since I've entered an order dismissing all charges the file can be closed with no further court dates. The State may file their notice of appeal in accordance with the applicable statutes." While the State undoubtedly knew the order existed by virtue of the magistrate court's email, our more recent rulings, aside from the unique scenario in *Sharpfish I*, do not support Ogden's claim that a party's mere knowledge of an order satisfies the written notice requirements of SDCL 23A-32-6. *See State v. Antuna*, 2024 S.D. 78, ¶ 15, 15 N.W.3d 439, 445 (rejecting a claim similar to Ogden's that a petition for discretionary appeal was untimely, based, in part, on our determination that there was "insufficient evidence in the record to establish that Antuna *served the State with notice of entry* of [the order being appealed]" (emphasis added)).

[¶25.] For these reasons, the application of the relevant rules to the facts of this case does not support a dismissal for lack of appellate jurisdiction. Here, the order granting the motion to dismiss was entered on January 13, 2025, and the magistrate court emailed the parties on January 21. A written notice of entry was not filed until the State did so on February 18. Nine days later, on February 27, the State petitioned this Court for an intermediate appeal, which was within the proscribed ten-day time period of SDCL 23A-32-6. The State's petition was therefore timely, and the Court has appellate jurisdiction.[11]

---

11. The dissent, relying primarily on the Court's decision in *Labidee v. City of Pierre*, 177 N.W. 499 (S.D. 1920), and what appears to be dicta in *In re T.C.*, 278 N.W.2d 452, 454 (S.D. 1979), concludes that the State waived its right to receive a notice of entry of the order by filing a notice of appeal, and

(continued . . .)

### 2. *Whether the magistrate court abused its discretion by considering Ogden's jurisdictional challenge and by taking evidence.*

[¶26.] The State argues the "magistrate court erred and abused its discretion when it dismissed the charges based upon its pretrial factual determination regarding *venue*, and its holding that the court lacked subject-matter *jurisdiction*."

---

(. . . continued)

consequently, the State's later petition for discretionary appeal was untimely. But the Court's appellate jurisdiction was not at issue in *In re T.C.* Instead, that case involved issues related to whether a circuit court deprived the appellant of the ability to object to the court's findings of fact, conclusions of law, and dispositional decree by violating notice provisions in SDCL 15-6-52(a). We rejected the appellant's claims, noting that SDCL 15-6-52(a) did not contain some of the requirements asserted by appellant. 278 N.W.2d at 454. We then noted that the purpose of a notice of entry of a judgment was to set the time within which a judgment could be appealed and cited *Labidee* for the premise that the appellant had waived her right to notice of entry by filing her appeal before receiving such notice. *Id.* Aside from the fact that this statement had nothing to do with alleged errors appellant asserted in *In re T.C.*, the citation to *Labidee* to support this broad premise was misplaced.

While *Labidee* supports the general notion that a party may waive the right to notice of entry, it did not declare that the filing of a notice of appeal constitutes a waiver of such notice in all circumstances. *Labidee* involved a much different scenario than the one here, and the opinion draws distinctions between an express and implied waiver, the latter of which is "questionable if there are not present some of the elements of estoppel." 177 N.W. at 501. In *Labidee*, after the circuit court entered an order overruling the defendant's demurrer to a complaint, the defendant sought and received a stay of all proceedings in the circuit court until such time within which an appeal could be taken had expired. *Id.* When determining that the motion for a stay constituted an implied waiver, this Court noted that the stay would prevent the giving of notice of entry of the order, and thus, "the time within which an appeal could be taken would never expire." *Id.* We then concluded that "the necessary element of estoppel to support an implied waiver" was present under the circumstances. *Id.* Unlike the circumstances in *Labidee*, after this Court dismissed the State's initial unauthorized appeal, there was nothing preventing Ogden from providing and filing a notice of entry of order triggering the timeframe in which the State could file a petition for discretionary appeal. Indeed, Ogden has not even raised the issue of implied waiver and estoppel here.

(Emphasis added.) The State has referred to both venue and jurisdiction before the magistrate court and in its briefing on appeal. Venue concerns the county or locality of prosecution. *State v. Whistler*, 2014 S.D. 58, ¶¶ 11–12, 851 N.W.2d 905, 909–10. Jurisdiction concerns the court's ability to "act on a criminal charge[.]" *LaCroix v. Fluke*, 2022 S.D. 29, ¶ 20, 975 N.W.2d 150, 158 (citation omitted); *see State v. Haase*, 446 N.W.2d 62, 64 (S.D. 1989) (per curiam) (distinguishing criminal subject matter jurisdiction as a court's power to adjudicate a case and venue as the appropriate county for prosecution); 4 Wayne R. LaFave et al., Criminal Procedure § 16.1(a) (4th ed. 2025) (same). Ogden argued to the magistrate court that it lacked *jurisdiction*; he did not make any argument regarding *venue*. Moreover, the magistrate court dismissed the case for lack of jurisdiction. We, therefore, limit our analysis to this question.

[¶27.] "As this Court long ago explained, before a court can 'act on a criminal charge[,]' the 'court must have personal and subject matter jurisdiction[.]'" *LaCroix*, 2022 S.D. 29, ¶ 20, 975 N.W.2d at 158 (citation omitted) (alterations in original). If either is absent, the judgment is "wholly void and without any force or effect whatever." *Id.* ¶ 20, 975 N.W.2d at 159 (quoting *Haase*, 446 N.W.2d at 64). Therefore, this threshold requirement "may be challenged at any time during the pendency of the proceedings and for the first time on appeal." *State v. Neitge*, 2000 S.D. 37, ¶ 9, 607 N.W.2d 258, 260 (first quoting *Haase*, 446 N.W.2d at 64; then citing SDCL 23A-8-3). Without subject matter jurisdiction, a court is without the power to "hear a case, determine the facts, apply the law[,] and set a penalty."

*Haase*, 446 N.W.2d at 64 (citation omitted). Ogden's motion to dismiss challenged the magistrate court's authority to do just that.

[¶28.] The State appears to argue, however, that the magistrate court could not dismiss the information based on lack of jurisdiction, maintaining that the court's authority to dismiss the information is restricted to the nine grounds in SDCL 23A-8-2, which provides:

> Upon motion of a defendant made pursuant to subdivision 23A-8-3(1), (2), or (3), the court must dismiss an indictment or information in any of the following cases:
>
> (1)     When it is not found, endorsed, and presented or filed as prescribed by this title;
>
> (2)     When the names of the witnesses are not inserted at the foot of the indictment or information or endorsed thereon;
>
> (3)     When it does not substantially conform to the requirements of this title;
>
> (4)     When more than one offense is charged in a single count;
>
> (5)     When it does not describe a public offense;
>
> (6)     When it contains matter which, if true, would constitute a legal justification or excuse of the offense charged, or other bar to the prosecution;
>
> (7)     When the grand jury which filed the indictment had no legal authority to inquire into the offense charged because it was not within the jurisdiction of the grand jury or *because the court was without jurisdiction of the offense charged*;
>
> (8)     When a person was permitted to be present during the session of the grand jury while the charge embraced in the indictment was under consideration, except as provided in § 23A-5-11; or

>   (9)     When a defendant charged by information did not have or waive a preliminary hearing before the information was filed.

(Emphasis added.) The State argues these nine grounds are exclusive, relying primarily on *State v. Vatne*, for this proposition and asserting the court erred because the dismissal was not based on any of these grounds. 2003 S.D. 31, ¶ 14, 659 N.W.2d 380, 384.

[¶29.] The *Vatne* court's prior description of these nine grounds as "exclusive" is somewhat misleading because there are a number of additional grounds under which criminal charges can be dismissed and which are not specifically enumerated in SDCL 23A-8-2. *See, e.g.*, *State v. O'Neal*, 2024 S.D. 40, ¶ 37, 9 N.W.3d 728, 745 ("Dismissal of an indictment is warranted when there is a showing 'that the preindictment delay . . . caused substantial prejudice to [a defendants'] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused.'" (alterations in original) (quoting *United States v. Marion*, 404 U.S. 307, 324 (1971))); SDCL 23A-44-5.1(5) (providing for dismissal of the offenses charged if the 180-day rule is violated).

[¶30.] But here, Ogden's motion to dismiss was based on lack of jurisdiction, which is one of the grounds enumerated in SDCL 23A-8-2. Pursuant to SDCL 23A-8-2(7), dismissal of an information shall be granted if "the court was without jurisdiction of the offense charged." Additionally, Ogden's jurisdictional argument is a defense that is allowed to be brought "at any time during the pendency of the

-17-

proceedings." SDCL 23A-8-3(3).[12] To the extent a statutory basis was required for the magistrate court to consider Ogden's motion to dismiss the information, under the scenario presented here, such a basis existed under both SDCL 23A-8-2(7) and 23A-8-3(3).

[¶31.] The State next contends that the magistrate court abused its discretion when it "inquired into the legality or sufficiency of the evidence and testimony when considering dismissal." The State argues that "[a]n indictment returned by a legally constituted and unbiased grand jury, like an information drawn by a prosecutor, if valid on its face, is enough to call for trial of the charge on the merits." *State v. Cameron*, 1999 S.D. 70, ¶ 11, 596 N.W.2d 49, 52 (citation omitted). The State maintains that the information was facially valid, as it alleged the offenses occurred in Union County, and the court could not inquire into the "legality or sufficiency of the evidence" concerning jurisdiction. In response, Ogden maintains that the magistrate court "did not consider whether the facts constituted the crime charged, or whether the facts were legally insufficient" to charge or

12. SDCL 23A-8-3 provides in part:

> Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion. Motions may be written or oral at the discretion of the judge. The following must be raised prior to trial:
>
> . . .
> (3)     Defenses and objections based on defects in the indictment or information (other than that it fails to show jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings)[.]

convict him, but simply "interpreted the law regarding South Dakota's jurisdiction on boundary waters and correctly concluded that the [c]ourt lacked jurisdiction."

[¶32.] In a criminal proceeding, when a court must determine whether it has jurisdiction, it does not thereby "inquire into the legality or sufficiency of the evidence upon which indictment is based." *Cf. State v. Springer-Ertl*, 1997 S.D. 128, ¶ 8, 570 N.W.2d 39, 41 (reversing a lower court's decision dismissing an information for lack of probable cause when it inquired into the "legality or sufficiency of the evidence"). Rather, it determines whether it has the power or authority to "hear [the] case, determine the facts, apply the law[,] and set a penalty." *Haase*, 446 N.W.2d at 64. And to make this decision, "the court may hold hearings, consider live testimony, or review affidavits and documents." *Chase Alone v. C. Brunsch, Inc.*, 2019 S.D. 41, ¶ 12, 931 N.W.2d 707, 711 (examining civil jurisdictional challenges); *see State v. Winckler*, 2026 S.D. 19, ¶ 17, 33 N.W.3d 58, 68 (reviewing a jurisdictional issue in a criminal case and noting that, when considering "disputes regarding the facts upon which subject matter jurisdiction rests[,]" a circuit court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case" (quoting *Chase Alone*, 2019 S.D. 41, ¶ 12, 931 N.W.2d at 710–11)).

[¶33.] In order to determine whether it had jurisdiction, the magistrate court permitted the testimony of Officer Vanden Bosch. His testimony was primarily focused on the location of the stop on the river, not on the details of the offense, such as whether Ogden's blood alcohol content was over the legal limit or whether Ogden's conduct rose to the level of resisting arrest. The court's findings of fact and conclusions of law similarly focused on whether Ogden was within South Dakota's

jurisdictional reach. The court found that based on the evidence presented, Ogden was stopped on the Nebraska side of the centerline of the designed channel and that the State produced no compelling evidence to the contrary. The court made no findings regarding the sufficiency of the evidence necessary to convict Ogden of the offenses charged, but limited its inquiry to whether it had the power or authority to hear the case against Ogden. *See Haase*, 446 N.W.2d at 64. We therefore conclude that the magistrate court did not abuse its discretion when it received evidence on this issue.

[¶34.] Further, we cannot say that the magistrate court clearly erred in determining Ogden's location. *State v. Medicine*, 2015 S.D. 45, ¶ 5, 865 N.W.2d 492, 495 ("[W]e review the circuit court's factual findings for clear error[.]" (citation omitted)). The court made four factual findings on the issue of Ogden's location at the time of the stop.

5. On July 27, 2024, South Dakota wildlife conservation Officer Josh Vanden [B]osch initiated a stop of the Defendant's boat near the Nebraska shoreline of Dakota County, Nebraska.

6. Defendant presented evidence corroborating that the initial observation and stop of Defendant's boat occurred near the Nebraska shoreline.

7. Plaintiff presented no evidence that the initial observation and stop of the Defendant's boat occurred on the South Dakota side of the centerline of the designed channel of the Missouri River.

8. Officer Vanden [B]osch's initial observation and stop of the Defendant's boat occurred on the Nebraska side of the centerline of the designed channel of the Missouri River.

Officer Vanden Bosch testified that he asked Ogden to bring his boat away from rocks located near the Nebraska shore. Based upon the record before this Court, including the body camera footage, these findings were not clearly erroneous.

### 3. Whether the magistrate court erred by dismissing the case for lack of jurisdiction over Ogden's offense.

[¶35.] Our determination that the magistrate court did not err in holding an evidentiary hearing or by finding that Ogden was located on the Nebraska side of the river does not, however, end our inquiry regarding whether the court erred in dismissing Ogden's charges. We must consider whether South Dakota has concurrent jurisdiction on the Missouri River at the location of Ogden's arrest on the Nebraska side of the centerline of the designed channel—a question of first impression.

[¶36.] Ogden's core factual argument—that he was in Nebraska at all relevant times—challenges South Dakota's authority to enforce its penal laws based on the situs of the crime and thus implicates South Dakota's jurisdiction. Unless ceded, South Dakota's "jurisdiction . . . extend[s] to all territory within its established boundaries[.]" SDCL 1-1-1. "South Dakota . . . courts only have jurisdiction to prosecute and punish a criminal offense committed 'in whole or in part within the [S]tate.'" *In re Issuance of Summons Compelling Essential Witness To Appear & Testify in State of Minn.*, 2018 S.D. 16, ¶ 15, 908 N.W.2d 160, 166 (alteration in original) (quoting *State v. Winckler*, 260 N.W.2d 356, 360 (S.D. 1977)).

[¶37.] Of the contiguous states, 44 have a boundary formed by a river and state boundary disputes are historically common, as are issues of criminal jurisdiction on state boundary waters. *See Potomac Shores, Inc. v. River Riders,*

*Inc.*, 98 A.3d 1048, 1051 (Md. Ct. Spec. App. 2014). In order to ensure that boundary waters were not lawless zones beyond either state's jurisdiction, in many instances, Congress paved the way for concurrent jurisdiction "in the enabling acts of new states whose boundaries presented the problem." Note, *Concurrent Jurisdiction of States over Boundary Waters*, 22 Harv. L. Rev. 599, 599–600 (1909). The United States Supreme Court in *Nielsen v. Oregon* explained, "one purpose, perhaps the primary purpose, in the grant of concurrent jurisdiction, was to avoid any nice question as to whether a criminal act sought to be prosecuted was committed on one side or the other of the exact boundary in the channel, that boundary sometimes changing by reason of the shifting of the channel." 212 U.S. 315, 320 (1909).

[¶38.] It is well established that for a state to exercise concurrent jurisdiction beyond its territorial border over a boundary water there must be an authorization of such authority. *See* id. at 319–21 (examining Oregon's attempt to prosecute a fisherman on a boundary water through a congressional authorization of concurrent jurisdiction with the State of Washington on said waters). As one court summarized:

> Generally speaking, the jurisdiction of a state is merely
> coextensive with its boundaries, so that where a stream forms
> the boundary between two states, neither would have
> jurisdiction beyond the center of the stream, or beyond whatever
> may constitute the actual dividing line, in the absence of some
> lawful agreement or provision extending each state's jurisdiction
> over the entire stream.

*Smoot v. Fischer*, 248 S.W.2d 38, 41 (Mo. Ct. App. 1952). Provisions extending jurisdiction are commonly sourced to interstate agreements and congressional acts,

such as a state's enabling act or its territorial predecessor's organic act. To determine whether South Dakota had jurisdiction over Ogden's arrest we begin with an examination of the creation of the Dakota Territory and thereafter the State of South Dakota.

### Enabling and organic acts

[¶39.]        Prior to the creation of the Dakota Territory, the Nebraska Territory stretched into present day western South Dakota.[13]  *See* Act of May 30, 1854, ch. 59, § 1, 10 Stat. 277, 277.  At this time, the Nebraska Territory's eastern boundary was

---

13.    To fully understand the history of the area at issue, we provide the following recitation of territorial enactments prior to the formation of the Dakota Territory.

Following the 1803 Louisiana Purchase, control of the relevant area of the Missouri River was repeatedly passed from territorial government to territorial government.  Sarah Lanier Hollingsworth, *A Bibliographic Surv. of Prestatehood Legal Res. for the State of S.D.*, *in* Prestatehood Legal Materials: A Fifty-State Rsch. Guide, including N.Y.C. and D.C. 1077, 1081 (Michael Chiorazzi & Marquerite Most, eds., 2005).

After purchase of the relevant area from France in 1803, Congress shortly thereafter established the District of Louisiana.  *Id.* at 1102.  In 1805, Congress established the Louisiana Territory.  *Id.* at 1103.  Following the State of Louisiana's admission to the Union, the northern portion of the territory, which included the location of Ogden's arrest, was renamed the Missouri Territory in 1812.  *Id.*  In 1834, the Michigan Territory was expanded into present day eastern South Dakota with the Missouri River as its western boundary.  *Id.*  This was short-lived; in 1836 the area was renamed the Wisconsin Territory, and in 1838, it once again changed to the Iowa Territory.  *Id.* at 1104.  In 1846, Congress formed the Minnesota Territory with the Missouri River and the at-issue area acting as the territory's western border.  *Id.*  While retaining the Minnesota Territory, in 1854 Congress formed the neighboring Nebraska Territory, with the Missouri River as its eastern border.  *Id.* at 1105.  But once again in 1857, due to the State of Minnesota's admission to the Union, the area between the Missouri River and the newly-formed State of Minnesota was "without an organized government."  *Id.*  This remained the case until 1861, when the Dakota Territory was formed.

the main channel of the Missouri River which bordered the Minnesota Territory.
*Id.* This boundary changed when Congress created the Dakota Territory in March
1861. Act of Mar. 2, 1861, ch. 86, § 1, 12 Stat. 239, 239. The Dakota Territory's
original southern boundary ran east from the intersection of the Big Sioux and
Missouri rivers "up the Missouri river, and along the boundary line of the Territory
of Nebraska[.]" *Id.* The Nebraska Territory's boundary line being the main channel
of the Missouri River. § 1, 10 Stat. at 277.

[¶40.]     The same boundary line was adopted in the State of Nebraska's
enabling act, which stated that Nebraska's northern border shall run "down the
middle of the channel of said Missouri river[.]" Act of Apr. 19, 1864, ch. 59, § 2, 13
Stat. 47, 47. Subsequently, the Dakota Territory was divided, with South Dakota
assuming the southern portion. Act of Feb. 22, 1889, ch. 180, § 2, 25 Stat. 676, 676.
When Congress authored South Dakota's enabling act, it did not expand South
Dakota's southern boundary beyond its territorial predecessor. *Id.*

[¶41.]     All four sources of authority—the Nebraska Territory's organic act, the
Dakota Territory's organic act, the State of Nebraska's enabling act, and the State
of South Dakota's enabling act—are silent as to whether they shared concurrent
jurisdiction along boundary waters.[14] This lack of jurisdictional authority stands in

---

14.     As explained, numerous territorial governments have controlled the at-issue
        area of the Missouri River prior to the admission of Nebraska and South
        Dakota to the Union. *See supra* ¶ 39 n.13.

        In line with the four sources of authority analyzed above, the organic acts of
        the District of Louisiana, Louisiana Territory, Missouri Territory, Michigan
        Territory, Wisconsin Territory, Minnesota Territory, Iowa Territory, and
        Nebraska Territory did not provide for concurrent jurisdiction over boundary
                                                              (continued . . .)

#31010

stark contrast to congressional acts forming other territories and admitting other

states to the Union, such as Washington[15], Iowa[16], Minnesota[17],

---

(. . . continued)

    waters. *Compare* Act of Oct. 31, 1803, ch. 1, § 1, 2 Stat. 245, 245 (Louisiana Purchase); Act of Mar. 26, 1804, ch. 38, § 1, 2 Stat. 283, 283 (Louisiana Territory); Act of Mar. 3, 1805, ch. 31, § 1, 2 Stat. 331, 331 (District of Louisiana); Act of June 4, 1812, ch. 95, § 1, 2 Stat. 743, 743; (Missouri Territory); Act of June 28, 1834, ch. 98, § 1, 4 Stat. 701, 701 (Michigan Territory); Act of Apr. 20, 1836, ch. 54, § 1, 5 Stat. 10, 11 (Wisconsin Territory); Act of Mar. 3, 1849, ch. 121, § 1, 9 Stat. 403, 403–04 (Minnesota Territory); Act of June 12, 1838, ch. 96, § 1, 5 Stat. 235, 235 (Iowa Territory); Act of May 30, 1854, ch. 59, § 1, 10 Stat. 277, 277 (Nebraska Territory), *with* Act of Mar. 6, 1820, ch. 22, § 2, 3 Stat. 545, 546 (granting the State of Missouri concurrent jurisdiction over boundary waters).

15.    The Washington Territory's organic act provided "the Territory of Oregon and the Territory of Washington shall have concurrent jurisdiction over all offen[s]es committed on the Columbia River, where said river forms a common boundary between said Territories." Act of Mar. 2, 1853, ch. 90, § 21, 10 Stat. 172, 179; *Nielsen v. Oregon*, 212 U.S. 315, 316 (examining Washington and Oregon's concurrent jurisdiction over boundary waters).

16.    Iowa's enabling act provided concurrent jurisdiction over its boundary waters, including the Missouri River which separates Iowa from Nebraska. Act of Mar. 3, 1845, ch. 48, § 3, 5 Stat. 742, 743 (providing that "the said State of Iowa shall have concurrent jurisdiction on the river Mississippi, and every other river bordering on the said State of Iowa, so far as the said rivers shall form a common boundary to said State"). Although Nebraska's enabling act does not provide concurrent jurisdiction on Nebraska's boundary waters, Iowa's grant of such jurisdiction did "not deprive Nebraska of [the] power to legislate . . . within its own territorial limits." *Miller v. McLaughlin*, 281 U.S. 261, 263 (1930) (citation omitted).

17.    Minnesota's enabling act provided "[t]hat the said State of Minnesota shall have concurrent jurisdiction on the Mississippi and all other rivers and waters bordering on the said State of Minnesota[.]" Act of Feb. 26, 1857, ch. 60, § 2, 11 Stat. 166, 166; *State v. George*, 63 N.W. 100, 100–01 (Minn. 1895) (explaining Minnesota and Wisconsin's enabling acts); *Christian v. Birch*, 763 N.W.2d 50, 55–56 (Minn. Ct. App. 2009) (reaffirming Minnesota and Wisconsin's concurrent jurisdiction over boundary waters).

Wisconsin[18], and Illinois[19], which expressly provide for concurrent jurisdiction on boundary waters.

[¶42.] For reasons unknown to this Court, when Congress admitted South Dakota to the Union, it did not include an authorization of concurrent jurisdiction on boundary waters in the State's enabling act. Our State's founding documents instead provide that, at the location at issue, the boundary is the centerline of the Missouri River's main channel. § 1, 12 Stat. at 239; § 2, 25 Stat. at 676. Thus, for the State to assert jurisdiction over Ogden at the location of his arrest, it must rely on an authorization of concurrent jurisdiction occurring after South Dakota's grant of statehood.

*Federal law*

[¶43.] As one of its principal sources of jurisdictional authority, the State argues that 33 U.S.C. § 11 "recognizes" South Dakota's concurrent jurisdiction over boundary waters. Enacted in 1921, this statute, entitled "Authority for compact between Middle Northwest States as to jurisdiction of offenses committed on boundary waters[,]" provides:

---

18. Wisconsin's enabling act provided that "the said State of Wisconsin shall have concurrent jurisdiction on the Mississippi, and all other rivers and waters bordering on the said State of Wisconsin, so far as the same shall form a common boundary to said State and any other State[.]" Act of Aug. 6, 1846, ch. 89, § 3, 9 Stat. 56, 57; *see Roberts v. Fullerton*, 93 N.W. 1111, 1111 (Wis. 1903) (examining Wisconsin's concurrent jurisdiction over boundary waters).

19. Illinois's enabling act provided that "the said state shall have concurrent jurisdiction with the state of Indiana on the Wabash river, so far as said river shall form a common boundary to both, and also concurrent jurisdiction on the Mississippi river, with any state or states to be formed west thereof[.]" Act of Apr. 18, 1818, ch. 67, § 2, 3 Stat. 428, 429.

-26-

> The consent of the Congress is given to the States of North Dakota, South Dakota, Minnesota, Wisconsin, Iowa, and Nebraska, or any two or more of them, by such agreement or compact as they may deem desirable or necessary, or as may be evidenced by legislative acts enacted by any two or more of said States, not in conflict with the Constitution of the United States or any law thereof, to determine and settle the jurisdiction to be exercised by said States, respectively, over offenses arising out of the violation of the laws of any of said States upon any of the waters forming the boundary lines between any two or more of said States, or waters through which such boundary line extends, and that the consent of the Congress be, and the same is, given to the concurrent jurisdiction agreed to by the States of Minnesota and South Dakota, as evidenced by the act of the Legislature of the State of Minnesota approved April 20, 1917, and the act of the Legislature of the State of South Dakota approved February 13, 1917.

33 U.S.C. § 11 (1921).

[¶44.] Through this statute, Congress permitted the enumerated midwestern states to settle issues of jurisdiction over common boundary waters by agreement, compact, or "legislative acts." In essence, 33 U.S.C. § 11 serves as authorization to enter into interstate compacts on specific subjects which typically must be approved by Congress. *See Texas v. New Mexico*, 602 U.S. 943, 950 (2024) ("[T]he U.S. Constitution's Compact Clause . . . permits States to enter into agreements among themselves, with the consent of Congress." (citing U.S. Const. art. I, § 10, cl. 3)). In fact, Minnesota and South Dakota entered into a compact, which is approved in 33 U.S.C. § 11. *See* Felix Frankfurter & James M. Landis, *The Compact Clause of the Const.–A Study in Interstate Adjustments*, 34 Yale L. J. 685, 745 (1925) (noting that in the 1921 enactment, "Congress consented to an agreement that had already been reached between [Minnesota and South Dakota] and was under consideration by

North Dakota, Wisconsin, Iowa[,] and Nebraska, dealing with the penal jurisdiction to be exercised by them over their boundary waters").[20]

[¶45.]    Because 33 U.S.C. § 11 does not in and of itself authorize South Dakota to exercise concurrent jurisdiction with Nebraska beyond the centerline of the channel of the Missouri River, we review the remaining potential sources of authority.

*Agreements, compacts, and state legislative acts*

[¶46.]    Since statehood, the Missouri River's main channel has shifted. In 1905, Congress approved the first South Dakota-Nebraska Boundary Compact (1905 Compact), which established a permanent compromise boundary line between Dakota County, Nebraska, and Union County, South Dakota, at "the middle of the main channel of the Missouri River[.]"  Act of Mar. 1, 1905, ch. 1295, § 1, 33 Stat.

---

20.    The State, in its brief, quotes statements from the Nebraska Supreme Court's decision in *Miller v. McLaughlin*, 224 N.W. 18 (Neb. 1929), *aff'd*, 281 U.S. 261 (1930), as support for its erroneous claim that 33 U.S.C. § 11 granted concurrent jurisdiction over offenses arising out of the violation of laws on the boundary waters of all the states named therein, including Nebraska.  The State's reliance on *Miller*, however, is misplaced.  Miller, a Nebraska resident, sought an injunction precluding the enforcement of Nebraska's law prohibiting the taking of fish from its waters with nets or traps as it relates to the Missouri River.  *Miller*, 224 N.W. at 19.  Nebraska's eastern boundary is the middle of the channel of the Missouri River.  *Id.* at 20.  Miller claimed that because Iowa, which has concurrent jurisdiction on the Missouri River, allows fish to be taken with nets and traps, Nebraska could not enforce its law on "*any* part of the river."  *Id.* at 19–20.  The Nebraska court rejected this claim and the United States Supreme Court affirmed, holding that "[t]he grant of concurrent jurisdiction to Iowa does not deprive Nebraska of power to legislate with respect to its own residents within its own territorial limits."  *Miller*, 281 U.S. at 263.  Both the Nebraska court and the United States Supreme Court referred to the Congressional grant of concurrent jurisdiction in *Iowa's enabling act*.  There is no mention of 33 U.S.C. § 11, or a compact or agreement between Nebraska and Iowa, in either opinion.

820, 820–21.[21]  After Congress approved the 1905 Compact, the South Dakota

Legislature enacted Senate Bill 243, which expanded Union County south to the

middle of the main channel of the Missouri River for "judicial purposes."  1905 S.D.

Sess. Laws ch. 95, § 1.  By doing so, the Legislature ensured that land and water

now within South Dakota's boundaries, as defined by the 1905 Compact, were also

under Union County's judicial jurisdiction.  In what appears to be companion

legislation in the following bi-annual legislative session, the 1907 Legislature

enacted Senate Bill 5 which, upon the constitutionally required approval of the

county's voters[22], expanded Union County to the boundary set by the 1905 Compact.

1907 S.D. Sess. Laws. ch. 245, §§ 1–2.  The statute would later become SDCL 7-1-

64, which presently provides that Union County extends to the Nebraska boundary

line.

[¶47.]  Shortly after South Dakota obtained statehood in 1889, an issue arose

regarding game wardens' ability to enforce laws on boundary waters.  Governor

Charles N. Herreid made such a point in his 1905 address to the Legislature:

> The Game Wardens are handicapped in the protection of fish in
> Big Stone Lake because the state line is an imaginary line

---

21.  This Court examined the 1905 Compact in *Dailey v. Ryan*, 71 S.D. 58,
     21 N.W.2d 61 (1945).  While the case did concern a jurisdictional
     dispute between Union County, South Dakota and Dakota County,
     Nebraska, the issue concerning the 1905 Compact was whether the
     boundary was fixed in 1905 or shifted as the Missouri River changed
     course.  *Id.* at 63.

22.  At the time, the South Dakota Constitution required that "All changes in
     county boundaries in counties already organized, before taking effect, shall be
     submitted to the electors of the county or counties to be affected thereby, at
     the next general election thereafter and be adopted by a majority of the votes
     cast in each county at such election."  S.D. Const. art. IX, § 1 (amended 1972).

> through the center of the lake. Poachers when captured always claim to have been "on the other side of the state line." A law should be passed giving Game Wardens concurrent jurisdiction over lakes and streams constituting the boundary line between states.

Charles N. Herreid, Governor, Biennial Message to the Ninth Legislative Session State of South Dakota 39 (Jan. 3, 1905). In response to the Governor's request, the Ninth Legislature passed House Bill 209, a law regulating the taking of fish. However, the law applied only to South Dakota's concurrent jurisdiction over Minnesota, Iowa, and North Dakota boundary waters. 1905 S.D. Sess. Laws ch. 113, § 2. In 1917, Minnesota enacted reciprocal legislation granting South Dakota concurrent jurisdiction over boundary waters. 1917 Minn. Laws. 850–51; 1917 S.D. Sess. Laws ch. 248, § 2. Although South Dakota's law was later amended to include Nebraska and would become SDCL 41-15-2, on which the State now relies, the State has not identified any reciprocal law enacted by Nebraska.

[¶48.]     In 1957, the Legislature created a "commission to fix boundaries with Nebraska." 1957 S.D. Sess. Laws ch. 317, § 1. In similar fashion, the State of Nebraska formed a commission and, in 1959, the two successfully negotiated a boundary compact which was contingent upon ratification by each state's legislature and Congress. 1959 S.D. Sess. Laws ch. 301, §§ 1–2. As with the 1905 Compact, the 1959 Compact set the boundary line at the center of the main channel of the Missouri River and did not provide for concurrent jurisdiction. *Id.* Although the South Dakota Legislature ratified the 1959 Compact, Nebraska did not follow suit, leaving the 1905 Compact as the controlling boundary. S.D. Compiled Laws of

1967, vol. 1, 965 ("Nebraska boundary [1959] compact rendered ineffective by failure of Nebraska to ratify").

[¶49.]     In 1963, the South Dakota Attorney General provided an opinion on a similar issue regarding a "spillway jurisdiction dispute between Nebraska and South Dakota[.]" 1963 S.D. Op. Att'y Gen. 9. While not expressly stated, it appears that the question involved South Dakota's ability to regulate fishing at the Gavins Point spillway, which borders Nebraska. *Id.* The opinion first noted that "a state's police power may be exercised and is effective only within its physical boundaries." *Id.* The opinion then points out that in 1861, through the Dakota Territory's organic act, Congress defined the South Dakota-Nebraska boundary "in the middle of the main channel" of the Missouri River. *Id.* The attorney general, therefore, concluded: "It is thus evident that fishing in the Gavins Point spillway can be directly regulated by that state in which the disputed waters lie, *to the exclusion of regulation by an adjacent state.*" *Id.* at 10 (emphasis added). The opinion further noted that the 1959 "interstate compact, found at SDC 55.5704 (1960 Supp.), is not binding on either Nebraska or South Dakota as the Nebraska legislature has failed to ratify said compact as required by SDC 55.5705 (1960 Supp.), both states seeking to act under Congressional authority theretofore given." *Id.* This 1963 Attorney General Opinion supports the conclusion that, at least as of 1963, the State was unable to point to any authorization for concurrent jurisdiction. Having provided this essential history, we turn to the State's argument concerning the 1989 Compact and current statutes.

[¶50.] In 1989, Congress approved the most recent South Dakota-Nebraska Boundary Compact which sets the boundary at the "centerline of the designed channel of the Missouri River[.]" Act of Nov. 28, 1989, Pub. L. 101–183, art. II(a), 103 Stat. 1328, 1330; SDCL 1-2-8, art. II(a). The State does not assert that the 1989 Compact on its face provides for concurrent jurisdiction on the boundary waters in question. Instead, the State argues the 1989 Compact's language "only addresses the ownership of *lands* on either side of the compromise boundary; not ownership of the *waters* overlying those lands," and thus, South Dakota's statutes providing concurrent jurisdiction on boundary waters have not been preempted and are controlling.

[¶51.] Relevant to the State's argument, the 1989 Compact states:

> On the effective date of this compact, the state of South Dakota hereby relinquishes to the state of Nebraska all sovereignty over lands lying on the Nebraska side of said compromise boundary and the state of Nebraska hereby relinquishes to the state of South Dakota all sovereignty over *lands* lying on the South Dakota side of the compromise boundary.

SDCL 1-2-8, art. III (emphasis added). In support of the argument, the State draws on principles of interstate compact interpretation, state sovereignty, the public trust doctrine, and the harmonious reading cannon.

[¶52.] A plain reading of the 1989 Compact however reveals that it is not limited in the manner espoused by the State. The 1989 Compact's findings and purpose declare that the Missouri River has "changed its course from time to time," and the "principal purpose of the states in executing this compact [was] to establish an identifiable compromise boundary[.]" SDCL 1-2-8, art. I. The 1989 Compact also states that its principal purposes are:

      (2) to *avoid multiple exercise of sovereignty and jurisdiction*
including matters of taxation, judicial and police powers and
exercise of administrative authority;

      (3) to encourage settlement and disposition of pending litigation
and criminal proceedings and avoid or minimize future
disputes and litigations;

. . .

      (5) to encourage the optimum mutual beneficial use of the
*Missouri River, its waters* and its facilities;

. . .

      (8) to express the intent and policy of the states that the
common boundary between said counties be established
within the confines of the Missouri River and both states
shall continue to have access to and use of the waters of the
river.

SDCL 1-2-8, art. I(b) (emphasis added). Because the text of the 1989 Compact
refers to the Missouri River, specifically, and to waters, generally, the State's *only
land* argument is unpersuasive.

[¶53.]      The State's remaining arguments are equally unconvincing. The State
argues that because the 1989 Compact does not expressly address concurrent
jurisdiction, we must consider "background principles of law that would have
informed the parties' understanding when they entered the Compact" quoting *New
York v. New Jersey*, 598 U.S. 218, 224 (2023). However, the State's application of
these background principles, such as the "notion that a State does not easily cede its
sovereignty" and the public trust doctrine, are misplaced because South Dakota did
not have concurrent jurisdiction to cede. Had Congress provided for concurrent
jurisdiction along boundary waters in South Dakota's enabling act, the State's
arguments may have merit, but Congress did not so provide.

[¶54.]      In addition to entering into a compact, 33 U.S.C. § 11 also authorizes
the enumerated states to settle jurisdiction over the waters forming the boundary

lines between their states by an agreement or legislative acts. The Department of Game, Fish and Parks is authorized, pursuant to SDCL 41-12-19, to "enter into agreements with the appropriate agencies of bordering states for the purpose of providing for reciprocal recognition of licenses and permits and reciprocal enforcement of regulations pertaining to hunting, fishing, boating, and trapping on the boundary waters of the state."[23] The Department has done so with Nebraska on the issue of fishing licenses and permits. ARSD 41:07:01:02.01.[24] However, neither

---

23. A similar authorization is in SDCL 41-8-40, which provides in part:

> The Department of Game, Fish and Parks may enter into agreements with the appropriate agencies of bordering states for the purpose of providing for reciprocal recognition of licenses and permits and reciprocal enforcement of regulations pertaining to hunting, fishing, boating, and trapping on the boundary waters and contiguous lands of the states.

24. ARSD 41:07:01:02.01 provides:

> Any person possessing a valid fishing license or permit issued by this state or Nebraska, or who is legally exempted from license or permit requirements may fish from a boat or bank with a hook and line, bow and arrow (paddlefish and rough fish), spear, or spear gun, or by snagging (paddlefish) in the South Dakota-Nebraska boundary waters. The person may also fish with a hook and line, bow and arrow (paddlefish and rough fish), spear, or spear gun, or by snagging (paddlefish) in the South Dakota portion of any oxbow lake in the South Dakota-Nebraska boundary waters. From Gavins Point Dam to 0.6 mile downstream, a nonresident Nebraska fishing permit is required of any person who is not a resident of Nebraska or this state if fishing from a boat or either bank. Any reciprocal privilege granted in this section is contingent upon a grant of a like privilege by the state of Nebraska to any hook and line angler who is licensed or exempted by this state. Any angler fishing in the South Dakota-Nebraska boundary waters shall follow the laws and regulations of the state in which the angler is licensed

(continued . . .)

the parties nor this Court have located any other agreement or compact between Nebraska and South Dakota authorizing concurrent jurisdiction over Ogden's alleged offenses.

[¶55.] The State next argues that SDCL 41-15-2 and SDCL 42-8-67 "establish concurrent jurisdiction over *all* boundary waters of the State." SDCL 41-15-2 provides:

> For the purpose of enforcing any of the laws under this title and the rules promulgated pursuant to this title, the courts of this state, and the conservation officers of this state, have jurisdiction over the entire boundary waters of the state, to the furthermost shore line. Concurrent jurisdiction of the courts and administrative officers of the adjoining states of Minnesota, North Dakota, Montana, Wyoming, Iowa, and Nebraska over all boundary waters between such states and this state, and the whole of such boundary waters, is hereby recognized.

SDCL 42-8-67 provides:

> For the purposes of this chapter, the courts and the conservation officers of this state have jurisdiction over the entire boundary waters of this state to the furthermost shorelines. The concurrent jurisdiction of the courts and administrative officers of the adjoining states of Minnesota, North Dakota, Montana, Wyoming, Iowa and Nebraska over all boundary waters between those states and this state, is hereby recognized.

[¶56.] While the two statutes expressly claim concurrent jurisdiction over the entirety of South Dakota's boundary waters, 33 U.S.C. § 11 requires evidence of a reciprocal legislative act from *Nebraska* providing for such jurisdiction. 33 U.S.C. § 11 (providing that the named states, including South Dakota and Nebraska, may "determine and settle the jurisdiction to be exercised by said States" through an

---

(. . . continued)
> or the state in which the angler is fishing, whichever are more restrictive.

"agreement or compact as they may deem desirable or necessary, or as may be evidenced by legislative acts enacted by any two or more of said States, not in conflict with the Constitution of the United States or any law thereof"). South Dakota is without the authority to unilaterally bind Nebraska to an authorization of concurrent jurisdiction. *See Miller v. McLaughlin*, 224 N.W. 18, 20 (Neb. 1929) ("One state cannot require another to unite in treaties, laws, contracts or compacts. . . . Each state, as to river waters within her own boundaries, has rights and powers not committed to the adjoining state."). Absent a similar statute being enacted by Nebraska, SDCL 42-8-67 and SDCL 41-15-2 cannot independently authorize South Dakota courts and officials to exercise concurrent jurisdiction over the portion of the Missouri River beyond South Dakota's border, as the State claims. Accordingly, the State of South Dakota may only exercise jurisdiction up to the centerline of the designed channel of the Missouri River.[25]

### Conclusion

[¶57.] The State timely filed its petition for intermediate appeal, vesting this Court with jurisdiction. The magistrate court did not abuse its discretion by addressing pretrial the matter of jurisdiction and permitting testimony to assist in resolving the issue and its determination on Ogden's location were not clearly erroneous. Lastly, there is no authority that would allow South Dakota to assert

---

25. In light of this conclusion, it is unnecessary to analyze the intent or plain language of South Dakota's statutes because they impermissibly extend South Dakota's jurisdiction beyond the centerline of the designed channel of the Missouri River. Further, we do not agree with the magistrate court's conclusion that the 1989 Compact preempts SDCL 41-15-2 and SDCL 42-8-67. Under 33 U.S.C. § 11, the two statutes may be evidence of legislative acts if a bordering state enacted reciprocal legislation.

#31010

concurrent jurisdiction beyond the centerline of the designed channel of the Missouri River, and the State, therefore, lacked jurisdiction.  We affirm the magistrate court's order granting the motion to dismiss.

[¶58.]        DEVANEY, Justice, and WHEELER, Circuit Court Judge, concur.

[¶59.]        SALTER and MYREN, Justices, dissent.

[¶60.]        WHEELER, Circuit Court Judge, sitting for JENSEN, Chief Justice, who deemed himself disqualified and did not participate.

[¶61.]        GUSINSKY, Justice, not having been a member of the Court at the time this action was considered by the Court, did not participate.

SALTER, Justice (dissenting).

[¶62.]        I believe we lack appellate jurisdiction here, and, with great respect, I think the Court and the parties are focused on the wrong jurisdictional inquiry. The critical question presented here is not whether the State *received* proper notice of entry of the magistrate judge's order on January 13, 2025, but, rather, whether the State *waived* its right to notice of entry by filing a notice of appeal on January 22, 2025.

[¶63.]        We have explained the purpose behind the notice of entry requirement in very practical terms:

> It gives to a party the power to set running the time after which his adversary may not appeal.  But it also assures each party that the statutory period of time within which he may appeal does not commence to run until his adversary has given such notice.

*Labidee v. City of Pierre*, 177 N.W. 499, 500 (S.D. 1920) (internal citation omitted); *see In re T.C.*, 278 N.W.2d 452, 454 (S.D. 1979) (same); *Havlik v. Havlik*, 2014 S.D. 84, ¶ 10, 857 N.W.2d 422, 425 (same).

[¶64.] But, of course, the right to notice of entry, like other rights, can be waived, as we have held for over a century. *See Labidee*, 177 N.W. at 500 ("We have no hesitancy in holding that the giving of such notice may be waived.").[26] And we have recognized that such a waiver can come in the form of a litigant's attempt to appeal before receiving notice of entry. *In re T.C.*, 278 N.W.2d at 454 ("By filing her notice of appeal before receiving a notice of entry of judgment, [the] appellant waived her right to such notice."); *see also Labidee*, 177 N.W. at 500 ("Appellant's application [staying proceedings until the time for appeal expired] therefore presupposed the giving of such notice and was a waiver of [the] same.").

[¶65.] Here, the State waived its right to notice of entry when it initially filed a notice of appeal on January 22, 2025, *despite the absence of notice of entry*. The fact that it was filed with the wrong reviewing court does not change this immutable fact. The time period for appeal commenced "as of the date of waiver," *Labidee*, 177 N.W. at 500, and the State's eventual petition for intermediate appeal was not filed until February 27, 2025, long after SDCL 23A-32-6's ten-day window had passed. Allowing the State to erase its waiver and then unilaterally commence

---

26. We have also recognized a waiver of notice of entry in the following cases: *Union Bond & Mortg. Co. v. Brown*, 267 N.W. 228, 229 (S.D. 1936) (per curiam); *Loewenthal Co. v. Ribnick*, 260 N.W. 267, 269 (S.D. 1935); *Downs v. Bruce Indep. Sch. Dist. No. 49*, 216 N.W. 949, 951 (S.D. 1927); *Fuller v. Anderson*, 210 N.W. 992, 994–95 (S.D. 1926).

a new appeal period through a belated notice of entry is unsupported by our cases and creates an unsound rule, which the Court apparently endorses.

[¶66.]    In a determined footnote, the Court mistakes the nature of the waiver rule and misses how it could be applied in different contexts. *See supra* ¶ 25 n.11. For instance, the Court's effort to relegate the rule in *T.C.* to dicta overlooks the fact that the waiver rule was central to our holding that an opposing party need not serve an appealing party with notice of entry because the "appellant waived her right to such notice" by filing her notice of appeal. *In re T.C.*, 278 N.W.2d at 454. It matters not at all that the case did not involve appellate jurisdiction; the rule is more fundamental and practical than that—a party filing a notice of appeal without notice of entry is dispensing with the need for it, plain and simple. *See, e.g.*, *Fuller v. Anderson*, 210 N.W. 992, 994 (S.D. 1926) (finding "ample support both in reason and upon the authorities" for the rule that a party waives notice of entry when it "affirmatively takes" an act that it was not obligated to do absent "formal notice").

[¶67.]    For these reasons, I would dismiss the appeal.

[¶68.]    MYREN, Justice, joins this writing.